885 F.2d 11
 14 Fed.R.Serv.3d 1480, 56 Ed. Law Rep. 54,
27 Soc.Sec.Rep.Ser. 34,
Medicare&Medicaid Gu 38,028
 WEST VIRGINIA UNIVERSITY HOSPITALS, INC.
v.
Robert CASEY, Governor, Commonwealth of Pennsylvania; John
White, Secretary, Department of Public Welfare; David S.
Feinberg, Director, Office of Medical Assistance; the
Department of Public Welfare, Appellants.
 No. 89-5165.
 United States Court of Appeals,
Third Circuit.
 Argued May 22, 1989.
Decided Sept. 5, 1989.
Rehearing and Rehearing In Banc Denied Oct. 5, 1989.
 
 Ernest D. Preate, Jr., Atty. Gen., Jerome T. Foerster, Deputy Atty. Gen. (argued), Calvin R. Koons, Sr. Deputy Atty. Gen., John G. Knorr, III, Chief Deputy Atty. Gen., Chief, Litigation Section, Office of Atty. Gen., Litigation Section, Harrisburg, Pa., for appellants.
 Robert T. Adams (argued), Julia Krebs-Markrich, Thomas J. Stallings, McGuire, Woods, Battle & Boothe, Richmond, Va., Jack M. Stover, Shearer, Mette, Evans & Woodside, Harrisburg, Pa., for appellees.
 Before BECKER, STAPLETON, and ROSENN, Circuit Judges.
 OPINION OF THE COURT
 ROSENN, Circuit Judge.
 
 
 1
 This interesting and complex appeal arises from the cross-fire currently trapping many hospitals across our nation between rising operating costs, on the one hand, and federal legislation aimed at the sharp containment of health delivery costs, on the other. The plaintiff, West Virginia University Hospitals, Inc. (WVUH or the Hospital), brought this action against certain Pennsylvania state officials under the Civil Rights Act, 42 U.S.C. Sec. 1983, alleging that the Pennsylvania program for providing medicaid reimbursement to an out-of-state hospital such as WVUH violated federal medicaid standards encompassed by Title XIX of the federal Social Security Act and violated the equal protection clause of the fourteenth amendment to the United States Constitution. WVUH also claimed that Pennsylvania's administrative appeals system was legally inadequate. The Hospital sought injunctive and declaratory relief invalidating the out-of-state aspects of the State's hospital reimbursement program.
 
 
 2
 After a bench trial before the United States District Court for the Middle District of Pennsylvania, the district court, in a thoughtful and painstaking opinion published at 701 F.Supp. 496 (M.D.Pa.1988), granted WVUH's request for relief on all counts. District Judge Rambo concluded that Pennsylvania's reimbursement program as applied to WVUH violated both federal statutory law and the equal protection clause of the Constitution, and held that the state's administrative appeal system was legally inadequate. She ordered Pennsylvania to revise its reimbursement methodology for WVUH and to formulate an adequate and meaningful medicaid administrative appeals system for the Hospital. Additionally, the court held that the State must permit WVUH to avail itself of the new appeals system to challenge its reimbursements from the date the Hospital commenced this action, rather than from the date of judgment. Finally, in an unpublished memorandum and order also issued the day of judgment, the district court awarded attorneys fees to the plaintiff pursuant to 42 U.S.C. Sec. 1988 in the amount of $500,000, of which $104,133 was attributable to expert witness fees and costs.
 
 
 3
 Pennsylvania appeals, challenging the decision on the merits, the scope of relief, and the award of expert witness fees. We affirm in part and reverse in part.
 
 I. FACTS
 
 4
 A. The parties.
 
 
 5
 The plaintiff WVUH is a university-affiliated teaching hospital located six miles south of the border between West Virginia and Pennsylvania. As a "tertiary care" hospital, WVUH provides a complex level of hospital and medical services not generally found in community hospitals. WVUH is the closest source of tertiary care for many residents in the Pennsylvania counties of Fayette and Greene, and provides services as well to residents of the Pennsylvania county of Washington. Historically, the Hospital has provided significant numbers of Pennsylvania medicaid patients with hospital care. For the years 1984 to 1987, WVUH gave inpatient hospital care to more Pennsylvania medicaid patients than did over one-half of the hospitals located in Pennsylvania. Five percent of all WVUH inpatient admissions are attributable to Pennsylvania medicaid recipients, while overall medicaid patients at WVUH constitute twenty-three percent of all admissions. WVUH is by far the largest out-of-state provider of medical services to Pennsylvania medicaid recipients.
 
 
 6
 The defendants in this action are Pennsylvania Governor Robert Casey, John F. White, the Secretary of Pennsylvania's Department of Public Welfare (DPW), and David Feinberg, the DPW official responsible for developing the Pennsylvania hospital reimbursement program at issue in this case. Although technically incorrect, for simplicity's sake this opinion may occasionally use the words "Pennsylvania" or "the State" when referring to the defendants.
 
 
 7
 B. The federal medicaid act.
 
 
 8
 In 1965 Congress enacted Title XIX of the Social Security Act (known as Medicaid or The Medicaid Act) to provide medical assistance to needy persons. 42 U.S.C. Sec. 1396 et seq. The purpose of the act was to provide a nationwide program of medical assistance for low income families and individuals. Medicaid became the primary source of health care coverage for the poor in America. The program is jointly financed with federal and state funds "and is basically administered by each state within certain broad requirements and guidelines." House Subcomm. on Health and the Environment, Data on the Medicaid Program: Eligibility, Services, Expenditures Fiscal Years 1967-77, H.R.Rep. No. 10, 95th Cong., 1st Sess. 1. The federal unit currently responsible for overseeing the medicaid program is the Health Care Financing Administration (HCFA). Federal law requires that one state agency must be designated as the single state agency responsible for the administration of the program. The state determines the scope of the services offered and generally determines the eligibility level for the programs. Id. at 1-2. Thus, the Act implemented a federal-state joint venture in which participating states receive federal medicaid funds in return for administering a medicaid program developed by the state within the parameters established by federal law and regulations.
 
 
 9
 Before 1980, Title XIX required states to pay hospitals the "reasonable cost" of rendering inpatient hospital services to medicaid recipients. This requirement translated into a retrospective form of reimbursement based on the actual costs incurred by the hospitals in providing medicaid services. In 1981, however, Congress, hoping to contain escalating medicaid costs, enacted as part of the 1981 Omnibus Budget Reconciliation Act (OBRA), P.L. 97-35, a new standard of hospital reimbursement. The OBRA replaced the "reasonable cost" standard with the current standard of "reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities." 42 U.S.C.A. Sec. 1396a(a)(13)(A) (West Supp.1989).
 
 
 10
 The 1981 OBRA also reduced federal oversight of states' reimbursement methodologies. Pursuant to section 1396a(a)(13)(A), the HCFA will approve a state reimbursement plan based on the state's satisfactory "assurances" that the plan is in compliance with federal requirements. These requirements are reflected both in the statute itself and in its implementing regulations published by the HCFA in interim form in 1981 and in final form in 1983. 42 C.F.R. Secs. 447.250-447.280.
 
 
 11
 C. The Pennsylvania medicaid program: operating cost,
 
 
 12
 direct medical education cost, and capital cost
 
 
 13
 reimbursement.
 
 
 14
 In Pennsylvania, DPW is the state agency responsible for administering medicaid. The medicaid program developed by DPW for the state is called the "Medicaid Assistance Program" or "MAP."
 
 
 15
 Consistent with the 1981 federal policy change with respect to hospital reimbursement, Pennsylvania developed a "prospective payment system" (PPS) for reimbursement of hospitals to contain escalating costs associated with medicaid services. This system, effective beginning fiscal year 1984-1985, replaced the retrospective method of reimbursement with a prospective method. Under this system, each hospital admission is classified according to the patient's illness diagnosis into 1 of 477 categories known as Diagnostic Related Groups (DRGs). 53 Fed.Reg. 38,576-89 (1988). A hospital is reimbursed in accordance with the flat fee fixed for the applicable category--regardless of the number of services used or the patient's length of stay. The DRG system, being prospective in nature, will sometimes undercompensate for a given service and will sometimes overcompensate. The expectation, however, is that in the aggregate an efficiently operated hospital will receive an appropriate amount to reimburse it for medicaid services.
 
 
 16
 Unquestionably, Pennsylvania's PPS treats in-state hospitals differently than out-of-state hospitals. Rate calculation for in-state hospitals depends on the type of hospital seeking reimbursement and the average cost for that type of hospital. Under the PPS, all participating in-state hospitals, approximately 233 in number, are assigned to one of seven groups. Grouping for in-state hospitals takes into account four concepts: teaching status, medicaid volume, environmental characteristics, and hospital costs. These four concepts are measured by a total of thirteen variables, including such things as the number of resident and intern programs, total number of patients, area wage index, and so on. The actual grouping of in-state hospitals is accomplished by a computer program.
 
 
 17
 After classifying the in-state hospitals, Pennsylvania then determines a group average cost per case, which is based on actual allowable costs and adjusted for inflation and budget neutrality. The hospitals in Group 1 have the highest group rate, and those in Group 7 have the lowest.
 
 
 18
 To determine the amount of reimbursement to in-state hospitals under the PPS, Pennsylvania multiplies the relative value of the DRG by the hospital's group average cost per case. The higher the group rate, the higher the payment for a given DRG. Thus, Pennsylvania pays a Group 1 hospital more to treat a given DRG than it pays a Group 2, 3, 4, 5, 6, or 7 hospital to treat that DRG.
 
 
 19
 Out-of-state hospitals, on the other hand, receive quite different treatment under the PPS. Unlike in-state hospitals, out-of-state hospitals are not grouped according to the concepts of hospital costs, teaching status, medicaid volume, and environment. Instead they are treated on the basis of one factor only: their geographical location outside Pennsylvania. Moreover, the group rate assigned to out-of-state hospitals is not based on the average allowable costs of that group based on historical data, but rather on the average of payments made to in-state hospital providers. To reimburse inpatient operating costs of out-of-state hospitals, Pennsylvania multiplies the relative value of the DRG assigned to the patient's illness by the Pennsylvania statewide average cost per case or pays the hospital's actual charges for treating that illness, whichever is lower.
 
 
 20
 Aside from operating cost reimbursement under the PPS, the MAP provides in-state hospitals additional hospital reimbursement on the basis of two other considerations: direct medical education costs (DME) and capital costs. Again, out-of-state hospitals are treated differently with respect to these two bases of medicaid reimbursement.
 
 
 21
 In-state hospitals receive an amount, in addition to their operating cost reimbursements, to reimburse them for the direct medical education (DME) costs (if any) associated with their medicaid service. For the years 1984 to 1986, Pennsylvania reimbursed in-state hospitals for the MAP share of their DME costs on an actual cost basis subject to certain limitations. Beginning fiscal year 1986-1987, Pennsylvania limits reimbursement to in-state hospitals for DME costs to 1.9 percent over the amount paid the hospital for DME costs the previous year, or the hospital's allowable DME costs, whichever is lower.
 
 
 22
 In contrast, Pennsylvania decided as a matter of policy not to pay out-of-state hospitals for DME costs associated with medicaid. Thus, teaching hospitals such as WVUH receive no DME cost reimbursement from Pennsylvania when they treat Pennsylvania medicaid patients.
 
 
 23
 Finally, in addition to reimbursement of inpatient operating costs under the PPS and in addition to payments for DME costs, Pennsylvania reimburses in-state hospitals for their allowable capital costs. For the period July 1, 1984, through June 30, 1986, reimbursement of in-state hospitals' capital costs was based on actual capital costs incurred. After that date, Pennsylvania initiated a prospective payment system for reimbursement of in-state hospitals' capital costs, to be phased in between July 1, 1986, and June 30, 1992. During that period, Pennsylvania would pay in-state hospitals for their actual capital costs on a decreasing percentage basis. After July 1, 1992, the state will reimburse all in-state hospitals at the same flat rate for their capital costs.
 
 
 24
 Out-of-state hospitals are not reimbursed for their capital costs in the same manner. The Pennsylvania medicaid prospective payment system has never reimbursed out-of-state hospitals using actual allowable costs of capital. Pennsylvania pays out-of-state hospitals an "add-on" for capital reimbursement that represents the average capital costs of all Pennsylvania hospitals. That "add-on" bears no relationship to the actual capital costs of out-of-state hospitals. Moreover, although the MAP gave in-state hospitals approximately ten years to adjust to a flat rate payment for capital costs, out-of-state hospitals were allowed no phase-in period to adjust to a prospective payment system for such costs.
 
 
 25
 D. The MAP appeals system.
 
 
 26
 Pursuant to federal regulation, the state medicaid agency must provide hospitals with a system by which to appeal. In Pennsylvania the administrative agency division that adjudicates the appeals is the DPW's Office of Hearings and Appeals (OHA). The OHA hearing officer recommends a decision to the Director of OHA, who either adopts or rejects the recommendation. Both parties have the right to request reconsideration from the Secretary of DPW. Outside of the administrative appeals process, review of the decision of the Director of OHA or the Secretary of DPW may be sought through the judicial system of the Commonwealth of Pennsylvania.
 
 II. THE DISTRICT COURT'S DECISION
 
 27
 WVUH initiated this action on July 16, 1986. After a six-day bench trial in May 1988, the district court concluded that in all aspects--operating costs, DME costs, and capital costs--Pennsylvania's reimbursement program fell considerably short of the requirements of Title XIX and violated federal law. Moreover, the court concluded that Pennsylvania's classification of hospitals, affording different treatment to hospitals depending on their location inside or outside the state, violated WVUH's rights under the equal protection clause of the United States Constitution. Finally, the court declared Pennsylvania's administrative appeal system invalid because it allowed a hospital to challenge only the application of the state's methodology, rather than the methodology itself. The court ordered Pennsylvania to revise its medicaid reimbursement program and administrative appeals system as they applied to WVUH and to allow the Hospital to employ the revised appeal system to challenge reimbursements from the date the action was commenced. Pursuant to 42 U.S.C. Sec. 1988, the district court awarded attorneys fees, which included expert witness fees, to WVUH as the prevailing party. The defendants appeal.
 
 
 28
 III. WVUH's RIGHT TO CHALLENGE THE REIMBURSEMENT PROGRAM
 
 
 29
 Before assessing the validity of Pennsylvania's medicaid reimbursement program, we first address the preliminary question whether WVUH has a cause of action entitling it to challenge the program.
 
 
 30
 The threshold issue in this case is whether WVUH can assert a cause of action against the defendant state officials under 42 U.S.C. Sec. 1983 for alleged violation of the federal medicaid statute. Section 1983 provides in relevant part that:
 
 
 31
 Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or ... the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.
 
 
 32
 42 U.S.C. Sec. 1983. Pennsylvania argues that a hospital cannot state a valid claim under section 1983 for alleged violation of the medicaid statute with respect to hospital reimbursement. This court has not previously had the opportunity to rule on this question of law.
 
 
 33
 Section 1983 provides a remedy for deprivation under color of state law of "any rights ... secured by the Constitution and laws." 42 U.S.C. Sec. 1983 (emphasis added). Interpreting this language in Maine v. Thiboutot, 448 U.S. 1, 100 S.Ct. 2502, 65 L.Ed.2d 555 (1980), the Supreme Coure held that the phrase "and laws" does not implicitly refer only to equal rights laws (making only equal rights violations actionable under section 1983), but rather refers generally to all federal statutory law. The plain language of section 1983, together with its legislative history and the Court's past treatment of the provision, compels the conclusion that causes of action under section 1983 are not limited to claims based on constitutional or equal rights violations. 448 U.S. at 6-8, 100 S.Ct. at 2505-06.
 
 
 34
 Thiboutot, however, does not stand for the broad proposition that section 1983 provides a cause of action for any violation of any federal law. As subsequent cases explain, a cause of action under section 1983 exists for violation of a federal law if two requirements are met. First, the federal law must create private rights enforceable under section 1983. Pennhurst State School and Hospital v. Halderman, 451 U.S. 1, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981). In Pennhurst the Court held that a section 1983 action did not lie for alleged violation of the Developmentally Disabled Assistance and Bill of Rights Act because that Act conferred no substantive rights but merely constituted a congressional declaration of policy. Id. at 18-27, 101 S.Ct. at 1540-44. With respect to the existence of the private rights requirement, valid federal regulations as well as federal statutes may create rights enforceable under section 1983. Wright v. City of Roanoke Redevelopment and Housing Authority, 479 U.S. 418, 431-32, 107 S.Ct. 766, 775, 93 L.Ed.2d 781 (1987) (HUD regulations defining statutory term "rent" as including a "reasonable amount" for utilities grants tenants rights enforceable under section 1983); Alexander v. Polk, 750 F.2d 250, 259 (3d Cir.1984) (WIC regulation creates enforceable right to notice of fair hearing).
 
 
 35
 Second, and stated negatively, the federal law must not reflect a congressional intent to foreclose private enforcement. Middlesex Cty. Sewerage Auth. v. National Sea Clammers Ass'n, 453 U.S. 1, 101 S.Ct. 2615, 69 L.Ed.2d 435 (1981). In Sea Clammers the Court held that a cause of action for violation of two federal environmental statutes did not lie because the comprehensive remedial schemes provided in those statutes reflect a congressional intent to foreclose a private remedy under section 1983. Id. at 21, 101 S.Ct. at 1542. The burden of proving a congressional intent to foreclose a section 1983 remedy, however, lies with the state actor, and that burden is not easily satisfied. Once it is determined that a federal provision creates an enforceable right, a cause of action exists under section 1983 for violation of that provision "unless the state actor demonstrates by express provision or other specific evidence from the statute itself that Congress intended to foreclose such private enforcement." Wright, 479 U.S. at 423, 107 S.Ct. at 771. A court deciding the issue may not " 'lightly conclude' " that Congress intended such foreclosure. Id. at 423-24, 107 S.Ct. at 770-71 (quoting Smith v. Robinson, 468 U.S. 992, 1012, 104 S.Ct. 3457, 3468, 82 L.Ed.2d 746 (1984)).[1]
 
 
 36
 Undertaking the analysis, then, the first question is whether the Medicaid Act, Title XIX of the federal Social Security Act, 42 U.S.C.A. Secs. 1396 through 1396s (West 1983 & Supp.1989), creates private rights in favor of hospitals participating in a state's medicaid program. Following the example set by the Court in Pennhurst, we seek the answer to this question in the language, purpose, and legislative history of the statute alleged to have been violated.
 
 
 37
 Generally, the Medicaid Act consists of numerous sections and subsections that together form a cooperative mosaic through which the federal government reimburses a portion of the payments made by participating states to hospitals and other providers furnishing care to eligible needy persons. States participating in the program are charged with administering the medicaid plan and distributing the state and federal funds. Participation in the program is voluntary, but once a state chooses to participate it is obligated to devise a medicaid plan that complies with the federal statutory and regulatory conditions of funding. See Pennhurst, 451 U.S. at 11, 101 S.Ct. at 1536 (state participation in federal-state cooperative program to treat developmentally disabled carries obligation to comply with federal law).
 
 
 38
 Section 1396a of the medicaid act enumerates the various federal requirements of state medicaid plans. In particular, subsection 1396a(a)(13)(A) imposes federal requirements on states' reimbursement to hospitals and other entities providing care to medicaid patients. It is this subsection that WVUH charges the defendants violated, and it is to this subsection, therefore, that we turn to ascertain whether it created substantive private rights enforceable under section 1983 in favor of hospitals offering care to medicaid patients.
 
 
 39
 We begin with the statutory language. Section 1396a(a)(13)(A) stipulates, in pertinent part, that
 
 
 40
 A State plan for medical assistance must-- ...
 
 
 41
 (13) provide--
 
 
 42
 (A) for payment ... of the hospital ... services provided under the plan through the use of rates (determined in accordance with methods and standards developed by the State and which, in the case of hospitals, take into account the situation of hospitals which serve a disproportionate number of low income patients with special needs ...) which the State finds, and makes assurances satisfactory to the Secretary, are reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities....
 
 
 43
 42 U.S.C.A. Sec. 1396a(a) (West Supp.1989) (emphasis added). The language of this subsection is "cast in the imperative," see Alexander v. Polk, 750 F.2d at 259, mandating the state to maintain at least some sort of standard (the nature of which is better left for the merits discussion) in its hospital reimbursement plan. The language succinctly sets forth a congressional command, which is wholly uncharacteristic of a mere suggestion or " 'nudge,' " Pennhurst, 451 U.S. at 19, 101 S.Ct. at 1540 (quoting Rosado v. Wyman, 397 U.S. 397, 413, 90 S.Ct. 1207, 1218, 25 L.Ed.2d 442 (1970)), in the direction of providing appropriate reimbursement of hospitals treating medicaid patients.
 
 
 44
 The construction of this subsection treating hospital reimbursement is parallel to the construction of the other forty-nine provisions imposing federal requirements on state medicaid programs. All provisions are prefaced by the language that "[a] State plan for medical assistance must...." There can be no mistaking that the stipulations of section 1396a(a) clearly constitute conditions that a state must meet to participate in the joint program.
 
 
 45
 In this respect, the statutory language of section 1396a(a) differs from the language examined in Pennhurst. In that case, the Court held that the "bill of rights" provision of the Developmentally Disabled Assistance and Bill of Rights Act, 42 U.S.C. Sec. 6010, did not create in favor of the mentally retarded any substantive rights to "appropriate treatment" in the "least restrictive environment." The Court compared the "bill of rights" provision with other sections of the act and observed that "[n]oticeably absent from Sec. 6010 is any language suggesting that Sec. 6010 is a 'condition' for the receipt of federal funding under the Act," making section 6010 stand "in sharp contrast" to the other sections that manifestly were conditions. 451 U.S. at 13, 101 S.Ct. at 1537. The Court's concern in Pennhurst that a state might not realize that its participation in a federal-state program is subject to federal conditions is relieved here by the express and imperative language of the Medicaid Act.
 
 
 46
 Defendants assert, however, that the purpose of the medicaid program weighs against finding that section 1396a(a)(13)(A) affords substantive rights to hospitals offering care to medicaid patients. They argue that imposing federal requirements with respect to hospital reimbursement does not equate with granting substantive rights in favor of hospitals to legally enforce reimbursement. The Medicaid Act helps states to fund a public assistance medical program for the financially needy, and therefore, defendants conclude any benefit conferred on hospitals is purely incidental. The beneficiaries of the act, argue defendants, are the needy persons assisted by medicaid, not the providers from whom the state buys medical services.
 
 
 47
 We recognize, of course, that the primary purpose of medicaid is to achieve the praiseworthy social objective of granting health care coverage to those who cannot afford it. It does not necessarily follow, however, that Title XIX grants substantive rights only to medicaid patients. Although the broad purpose of the Medicaid Act as a whole is to help the poor attain medical care, the specific purpose of section 1396a(a)(13)(A) is to assure state compliance with some federal standard of hospital reimbursement. The section sets up a plan for the adequate and reasonable reimbursement of hospitals which serve medicaid patients, and thus the hospitals are the section's "beneficiaries." Their interests and the interests of medicaid patients are bonded by a common goal, the delivery of adequate health care by the hospitals to state medicaid patients and the enjoyment of such care by the patients. The interests of both are intertwined and hospitals have a concrete stake in reimbursement in accordance with the federal statute and regulations.
 
 
 48
 Other courts have allowed health providers to challenge state medicaid plans as violative of Title XIX because they considered the interests of health providers and of medicaid patients to be "parallel." See, e.g., Coos Bay Care Center v. Oregon, Dep't of Human Resources, 803 F.2d 1060, 1063 (9th Cir.1986) (private health care facility's challenge of medicaid program states a claim under section 1983), cert. granted, 481 U.S. 1036, 107 S.Ct. 1970, 95 L.Ed.2d 811, vacated as moot, 484 U.S. 806, 108 S.Ct. 52, 98 L.Ed.2d 17 (1987); Nebraska Health Care Ass'n v. Dunning, 778 F.2d 1291, 1296 (8th Cir.1985) (long-term medical care facilities may maintain section 1983 action challenging medicaid plan). Although we approve of these cases, their reasoning may sometimes suggest that they are concerned with a sort of representative standing rather than the creation of federal rights in favor of the health providers.
 
 
 49
 We prefer to ground our decision more explicitly and precisely on our conclusion that Title XIX affords enforceable rights to hospitals serving medicaid patients. In this respect, we join with the Fourth Circuit, which recently arrived at the same conclusion after full analysis of the issue, see Virginia Hosp. Ass'n v. Baliles, 868 F.2d 653, 657-61 (4th Cir.1989), petition for cert. filed (June 15, 1989), and the Tenth Circuit, which adopted the Fourth Circuit's reasoning and result in a like case. See Amisub, Inc. v. Colorado Dep't of Social Services, 879 F.2d 789, 793-94 (10th Cir.1989). Cf. Silver v. Baggiano, 804 F.2d 1211, 1217 (11th Cir.1986) (expressly reserving question whether Social Security Act creates a right enforceable by a health provider under section 1983). Furthermore, once it is determined that WVUH has a private enforceable right under section 1983, we have no doubt as to its standing to bring this action. See Amisub, at 794.
 
 
 50
 The legislative history of section 1396a(a)(13)(A) buttresses our conclusion that WVUH has a private right to enforce the federal hospital reimbursement standard. In the Joint Explanatory Statement of the Committee of Conference commenting on the 1981 OBRA as enacted, Congress expressed its concern that state reimbursement methodologies adequately compensate hospitals for their care of medicaid patients. The report states: "the conferees intend that State hospital reimbursement policies should meet the costs that must be incurred by efficiently-administered hospitals in providing covered care and services to medicaid eligible as well as the costs required to provide care in conformity with State and Federal requirements." H.R.Conf.Rep. No. 208, 97th Cong., 1st Sess., 962, reprinted in 1981 U.S.Code Cong. & Admin.News 1010, 1324. The same report also emphasizes the inclusion in the Title XIX amendment of a provision "providing that the States, in developing their payment rates, take into account the situation of hospitals ... which serve a disproportionate number of low income patients." Id. We believe that Congress's concern with appropriate hospital reimbursement implies an intent to supply hospitals with an indispensable right to enforce state compliance with federal standards that, whether strictly or loosely, govern state reimbursement methodologies. Who else is more aggrieved by the absence of an adequate or reasonable hospital reimbursement rate than a disadvantaged hospital and who has a more compelling interest to press for a correction? We therefore conclude that the beneficiaries of section 1396a(a) are the hospitals that serve medicaid patients and that they have an enforceable private right.
 
 
 51
 Having determined that Title XIX supplies WVUH with private rights enforceable under section 1983, we next inquire whether the medicaid statute reflects a congressional intent to foreclose private enforcement. In accordance with the law as we described it above, WVUH has a remedy under section 1983 to enforce its rights under Title XIX unless defendants demonstrate that Congress intended to preclude private enforcement of that federal law.
 
 
 52
 Pennsylvania argues that Title XIX reflects a congressional intent to foreclose private enforcement of hospitals' rights because the statute requires the Department of Public Welfare to provide hospitals with an administrative remedy and because all state medicaid plans are subject to review by the Secretary of Health and Human Services and disapproval of a plan may result in suspension or reduction of federal payments. We believe, however, that Pennsylvania fails to carry its burden of proving that these remedial devices are " 'sufficiently comprehensive ... to demonstrate congressional intent to preclude the remedy of suits under Sec. 1983.' " Wright v. City of Roanoke Redevelopment & Housing Auth., 479 U.S. 418, 424, 107 S.Ct. 766, 771, 93 L.Ed.2d 781 (1987) (quoting Sea Clammers, 453 U.S. at 20, 101 S.Ct. at 2626). Title XIX gives no indication that the cut-off of funds to the federal agency is intended to supplant a section 1983 remedy. As the Supreme Court has recently held, "the existence of a state administrative remedy does not ordinarily foreclose resort to Sec. 1983." Wright, 479 U.S. at 427-28, 107 S.Ct. at 773 (citing Patsy v. Board of Regents of Florida, 457 U.S. 496, 516, 102 S.Ct. 2557, 2568, 73 L.Ed.2d 172 (1982)). Moreover, we fail to perceive how the cut-off of funds in futuro to the state agency effectively reimburses a hospital for services rendered to the state's medicaid patients in the past. We therefore conclude that WVUH states a valid claim under section 1983 for enforcement of its rights under the Social Security Act.[2]
 
 
 53
 IV. THE VALIDITY OF PENNSYLVANIA'S HOSPITAL REIMBURSEMENT PROGRAM
 
 
 54
 We now arrive at the heart of this case--whether Pennsylvania's plan for reimbursing out-of-state hospitals for their inpatient services to Pennsylvania medicaid recipients complies with federal statutory and regulatory law. The answer requires a close examination of Title XIX, its objectives, its legislative history, and its implementing regulations.
 
 
 55
 Section 1396a(a)(13)(A) provides in relevant part as follows:
 
 
 56
 A State plan for medical assistance must-- ... provide-- ... for payment ... of the hospital ... services provided under the plan through the use of rates (determined in accordance with methods and standards developed by the State and which, in the case of hospitals, take into account the situation of hospitals which serve a disproportionate number of low income patients with special needs ...) which the State finds, and makes assurances satisfactory to the Secretary, are reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities in order to provide care and services in conformity with applicable State and Federal laws, regulations, and quality and safety standards and to assure that individuals eligible for medical assistance have reasonable access (taking into account geographic location and reasonable travel time) to inpatient hospital services of adequate quality; and such State makes further assurances, satisfactory to the Secretary, for the filing of uniform cost reports by each hospital ... and periodic audits by the State of such reports....
 
 
 57
 42 U.S.C.A. Sec. 1396a (West Supp.1989). This section, as we read it, authorizes states to develop their own medicaid reimbursement standards and methodologies for payment of hospital services, but subjects those standards and methodologies to three general federal requirements.
 
 
 58
 The first requirement, deriving from the parenthetical modifying "rates," mandates that a state's reimbursement rates take into account the situations of those hospitals serving a disproportionate number of low income patients. The second and third requirements, found in the phrase following that parenthetical, require a state to find that its rates are reasonable and adequate to meet the necessary costs of an efficiently operated hospital and to assure medicaid patients of reasonable access to inpatient hospital care. The first requirement we term the "disproportionate share" requirement, the second, the "reasonable and adequate" requirement, and the third, the "reasonable access" requirement. The federal regulations implementing section 1396a(a)(13)(A), 42 C.F.R. Secs. 447.250-447.280, reiterate these statutory demands.
 
 
 59
 Our assessment of compliance with these three requirements is informed by the goals and purposes of the medicaid statute as reflected in its structure and legislative history. Section 1396a(a)(13)(A) was enacted as part of the 1981 Omnibus Budget Reconciliation Act, 95 Stat. 357, (OBRA) in an effort to contain the spiraling costs of inpatient hospital services and to reduce potentially stifling and expensive federal oversight of state methodologies. See Colorado Health Care Ass'n v. Colorado Dep't of Social Services, 842 F.2d 1158, 1165 (10th Cir.1988) (discussing purposes of the Boren Amendment); Wisconsin Hosp. Ass'n v. Reivitz, 733 F.2d 1226, 1228 (7th Cir.1984) (same). As explained in the House report accompanying an earlier version of the statute, Congress intended by section 1396a(a)(13)(A) to free states from the previous "reasonable cost" criterion and to encourage them to develop prospective reimbursement systems that would foster hospital efficiency and reduce medicaid costs. See H.R.Rep. No. 158, 97th Cong., 1st Sess. 292. States were to be allowed "greater latitude" and "greater flexibility" in designing their programs. See id. at 293; S.Rep. No. 139, 97th Cong., 1st Sess. 478, reprinted in 1981 U.S.Code Cong. & Admin.News 396, 744.
 
 
 60
 The states' discretion in devising new reimbursement standards and methodologies, however, was limited by the Congress's concern that medicaid recipients have reasonable access to medical services and that hospitals treating a disproportionate share of poor people receive adequate support from medicaid. Thus, a state's reimbursement rates may not be so low as to compel the closing of a dangerous number of hospitals or of a single medically important hospital, and thus compel medicaid recipients to travel an unreasonable distance to obtain medical care. See H.R.Rep. No. 158, 97th Cong., 1st Sess. 294 (expressing concern that rates not be so low as to discourage hospitals from treating medicaid patients). Moreover, because hospitals treating a large volume of medicaid patients are at the same time of singular importance to the health care of the poor and often already financially distressed, states must take into account these hospitals' special circumstances in setting reimbursement rates. See id. at 294-96 (discussing special needs and high social value of hospitals serving disproportionate number of poor people); H.R.Conf.Rep. No. 208, 97th Cong., 1st Sess. 962, reprinted in 1981 U.S.Code Cong. & Admin.News 1010, 1324 ("The conferees recognize that public hospitals and teaching hospitals which serve a large Medicaid and low income population are particularly dependent on Medicaid reimbursement, and are concerned that a State take into account the special situation that exists in these institutions in developing their rates.")
 
 
 61
 We believe that this scheme also contemplates a deferential standard of review by the courts in assessing compliance with the "reasonable and adequate" requirement of section 1396a(a)(13)(A). Applying a higher standard would run counter to the congressional intent that states be afforded considerable freedom in pursuing ways of limiting medicaid costs and encouraging efficiency. On the other hand, neither state budgetary restraints nor chauvinistic policies designed to curb access to out-of-state hospitals[3] can excuse a failure to conform to the federal "reasonable and adequate standard," Wisconsin Hosp. Ass'n, supra at 1235. In evaluating whether Pennsylvania's rates are "reasonable and adequate" to meet the costs of an efficiently operated hospital, we will not engage in an independent assessment of what rates we believe would be reasonable and adequate. Rather, we will only inquire whether the state's determination was arbitrary and capricious. See Mississippi Hospital Ass'n v. Heckler, 701 F.2d 511, 516 (5th Cir.1983).
 
 
 62
 At the same time, however, we believe that compliance with the remaining two federal requirements--reasonable access and disproportionate share--is subject to our plenary review. The legislative history manifests Congress's strong concern that these requirements be invariably and fully satisfied. We will not presume to declare how the State must satisfy these requirements, but neither will we defer to the State's judgment that the requirements have indeed been met. With these standards of review in mind, we begin our evaluation of Pennsylvania's reimbursement program.
 
 
 63
 We question first whether Pennsylvania's reimbursement program as it applies to WVUH fulfills the disproportionate share requirement. See 42 C.F.R. Sec. 447.253(b)(1)(ii)(A) (1988). The district court found that WVUH serves a disproportionate number of low income patients. Although only five percent of WVUH's admissions are Pennsylvania medicaid recipients, some thirty-eight percent of all WVUH admissions are low income persons.[4] The district court, appropriately taking a broad view of the issue, looked at WVUH's treatment of all low income patients, not just Pennsylvania medicaid patients, and found that the Hospital had established itself as a disproportionate share provider.
 
 
 64
 Pennsylvania, in its reimbursement system for in-state hospitals, accounts for disproportionate share through its grouping methodology for reimbursing operating costs. Under Pennsylvania's in-state plan, medicaid volume is one of the four concepts that determine a hospital's assignment to one of seven hospital groups. A high medicaid volume may boost a hospital to a higher group rating, allowing the hospital to command a higher reimbursement rate per DRG. The methodology thus uses high medicaid volume as a proxy for disproportionate share of low income patients. In contrast, when Pennsylvania sets its reimbursement rates for out-of-state hospitals, it does not consider those hospitals' shares of low income admissions. Rather, Pennsylvania reimburses all out-of-state hospitals on the basis of the average payment it makes to in-state hospitals.
 
 
 65
 Significantly, Pennsylvania chose this method without first undertaking any studies examining the effects of its methodology on out-of-state low income providers. The State stipulated in the pretrial memorandum of undisputed facts that Pennsylvania did no empirical studies with respect to out-of-state payments and did not look at individual cost data for out-of-state hospitals. Moreover, the State stipulated that "[t]he out-of-state reimbursement methodology does not contain any provision with which to identify out-of-state hospitals serving a disproportionate share of low income patients and by which to reimburse those hospitals any more than other out-of-state hospitals are reimbursed." Appellee's Addendum of statutes, regulations, and stipulation of undisputed facts p 133.
 
 
 66
 At oral argument, the State asserted that it accounted for disproportionate share of low-income providers when it determined the relative value of the DRG payment on the basis of in-state cost data. We fail to see, however, how this method fulfills the federal requirement. Pennsylvania assigned all out-of-state hospitals the average in-state payment rate, with no provision for increasing that rate on the basis of disproportionate share and no determination that the payment in itself would account for the needs of disproportionate share of low-income providers. We see nothing in the development or implementation of the State's out-of-state reimbursement plan that demonstrates compliance with the federal mandate that rates account for disproportionate share. We therefore conclude that Pennsylvania's operating costs reimbursement system is invalid insofar as it fails to account for out-of-state hospitals' disproportionate share of low income admissions.
 
 
 67
 The second requirement of state medicaid plans is that their rates assure medicaid recipients of reasonable access to quality hospital care, taking into account geographic location and reasonable travel time. See 42 C.F.R. Sec. 447.253(b)(1)(ii)(C) (1988).[5] Throughout the district court's opinion and the oral argument before us there ran an undercurrent of concern that inadequate reimbursement will encourage WVUH to close its doors to medicaid patients, leaving a considerable number of Pennsylvania residents without reasonable access to hospital care. At oral argument, defense counsel affirmed that without access to WVUH, some Pennsylvania medicaid patients would have to travel seventy miles or more to obtain tertiary hospital care. Moreover, the district court found, and Pennsylvania does not contest, that WVUH's withdrawal from the Pennsylvania medicaid plan would "jeopardize some Pennsylvania medicaid recipients' access to needed health care services." 701 F.Supp. at 509 (finding of fact # 181).
 
 
 68
 The record establishes that the closing of WVUH to Pennsylvania medicaid patients would deprive some of those patients of reasonable access to needed health care. It is not, however, so clearly established that Pennsylvania's reimbursement system will result in the Hospital's withdrawal from the Pennsylvania medicaid plan, although there is a probability that it will withdraw because of the large number of Pennsylvania medicaid patients it treats and the substantial disparity in reimbursement between Pennsylvania medicaid recipients in Pennsylvania and those treated at WVUH. The district court found that inadequate medicaid reimbursement will have "substantial financial consequences for the Hospital and will jeopardize its continued ability to care for MAP patients." 701 F.Supp. at 509 (finding of fact # 180). The court also found that although on the average an in-state hospital is reimbursed for approximately ninety-five percent of its costs in treating a Pennsylvania medicaid recipient, WVUH recoups only about fifty-four percent of its costs in treating a Pennsylvania medicaid patient. In view of these facts, one can reasonably anticipate that WVUH will not continue indefinitely to treat Pennsylvania medicaid patients under the State's present reimbursement mechanism.
 
 
 69
 Nevertheless, the present record is somewhat incomplete on the point. There is no evidence that the Hospital has stopped treating medicaid patients, and the president of WVUH testified that WVUH has not yet seriously considered quitting the Pennsylvania medicaid plan. App. at 141a. We are therefore unprepared on this record to invalidate Pennsylvania's overall reimbursement plan as it applies to WVUH on the basis of nonfulfillment of the reasonable access requirement. Such a holding, we believe, would require remand to the district court for finding of the relevant facts. As explained infra, however, a remand will not be necessary in light of our conclusion with respect to compliance with the third federal requirement as well as our conclusion concerning the first federal requirement, supra at 30.
 
 
 70
 The third requirement imposed by section 1396a(a)(13)(A) is that the state must find that its rates are "reasonable and adequate" to meet the costs of an efficiently operated hospital.[6] Whereas the substantive dimensions of the first two requirements could be fairly drawn from the statute and its legislative history, discerning congressional intent with respect to the substantive element of the reasonable and adequate requirement is a more daunting project.
 
 
 71
 The states, we need hardly reiterate, enjoy broad discretion in devising their hospital reimbursement plans. The changes instituted by 1981 OBRA contemplated state experimentation with medicaid methodologies and certainly contemplated reduction in the outlay of medicaid funds. Importantly, the 1981 OBRA definitely contemplated that states would implement prospective payment systems that would not be based on actual costs. In promulgating regulations implementing section 1396a(a)(13)(A), the HCFA expressly refused to set a federal standard prescribing "reasonable and adequate" rates. It did observe, however, that "the term is not a precise number, but rather a rate which falls within a range of what could be considered reasonable and adequate." See 48 Fed.Reg 56,046, 56,049 (Dec. 19, 1983). See also Colorado Health Care v. Colorado Dep't of Social Services, 842 F.2d 1158, 1167 (10th Cir.1988) ("Reasonableness has been characterized as a zone, not a pinpoint.") (citing Reivitz, 733 F.2d at 1233).
 
 
 72
 It follows from the departure from a cost-driven reimbursement standard that a state's plan does not violate the substantive provision of the reasonable and adequate requirement simply because it fails to reimburse one efficiently operated hospital its actual costs. What matters, rather, as the State vigorously argues, is whether the reimbursement rates to out-of-state hospitals in the aggregate are arbitrary and capricious.
 
 
 73
 Although Congress and the HCFA consciously declined to impose clearcut federal standards and requirements (with the exception of the reasonable access and disproportionate share requirements), the legislative history reflects congressional concerns that in turn may suggest some guidance as to what may constitute nonarbitrary reimbursement rates. The congressional reports concerning section 1396a(a)(13)(A) reflect a great sensitivity to the special needs of teaching and tertiary care hospitals. The House report accompanying an initial version of the statute states:
 
 
 74
 The Committee intends States to recognize that facilities that provide teaching services or other specialized tertiary care services that may have operating costs which exceed those of a community hospital. The Committee is concerned that the reimbursement methods established by the States recognize the need to provide a full range of both primary care and tertiary care services to Medicaid beneficiaries and take into account the differences in operating costs of the various types of facilities needed to provide this broad scope of services.... Thus, while the Committee recognizes that in this time of economic constraint and reductions in Federal funds for Medicaid, States must be given the flexibility necessary to improve the Medicaid reimbursement mechanism, the Committee does not want such policies to result in arbitrary and unduly low reimbursement levels for hospital services.
 
 
 75
 H.R.Rep. No. 158, 97th Cong., 1st Sess. 294. The subsequent House conference report echoes the concern for teaching hospitals:
 
 
 76
 The conferees recognize that public hospitals and teaching hospitals which serve a large medicaid and low income population are particularly dependent on Medicaid reimbursement, and are concerned that a State take into account the special situation that exists in these institutions in developing their rates.
 
 
 77
 H.R.Conf.Rep. No. 208, 97th Cong., 1st Sess. 962, reprinted in U.S.Code Cong. & Admin.News 1010, 1324.
 
 
 78
 Teaching hospitals, the district court found and the defendants do not contest, incur greater costs than nonteaching hospitals in delivering the same service. 701 F.Supp. at 515. The court found that the bulk of a teaching hospital's direct medical education (DME) costs is made up of residents' salaries. And, the court continued, residents spend about seventy-five percent of their time administering patient care. Thus, the court concluded, reimbursement of DME costs is in large part a reimbursement for patient care. Id.
 
 
 79
 Pennsylvania's reimbursement methodology for in-state hospitals provides for increased payments to teaching hospitals. The reimbursement system for operating costs identifies teaching status as one of the four concepts relevant to grouping in-state hospitals. Teaching status may therefore increase a hospital's reimbursement per DRG. Moreover, above and beyond the operating costs reimbursement, the Pennsylvania program reimburses in-state teaching hospitals for the medicaid share of DME costs that the hospitals incur.
 
 
 80
 Pennsylvania recognizes that a teaching hospital will not be adequately reimbursed for the costs associated with its teaching function if it is reimbursed at a rate deriving from the average indirect costs of teaching and nonteaching hospitals. 701 F.Supp. at 508. Moreover, Pennsylvania acknowledges that the failure of a payer to compensate for DME costs will necessarily shift those costs to another payer, and the failure of all payers to compensate for DME costs will eventually cause serious financial problems for the teaching hospital. Nevertheless, Pennsylvania provides no DME cost reimbursement to out-of-state hospitals.
 
 
 81
 Pennsylvania's justification is that it chose, as a matter of policy, not to reimburse the medicaid share of DME costs incurred by out-of-state hospitals in treating Pennsylvania medicaid patients because the state did not want to underwrite the medical education of residents and interns (even if some of them will be Pennsylvanian doctors)[7] at out-of-state hospitals. Pennsylvania's theory is "[n]othing in any law or regulation requires WVUH to be a teaching hospital." Thus, Pennsylvania presumes that rates would not be arbitrary even if they were to force WVUH to abandon its teaching role.
 
 
 82
 It is true that Congress did not specifically codify its manifest concern that medicaid rates be adequate to assure the continued existence of teaching hospitals. On the basis of only the statutory and regulatory language, there is therefore some merit to the proposition that rates fulfill the "reasonable and adequate" requirement, even if they do not reimburse DME costs, as long as they reimburse operating costs. Although it seems to strike a discordant note with the national agenda of the federal medicaid program, perhaps such state chauvinism as is displayed by Pennsylvania here might be tolerated under certain circumstances. On the other hand, we must give some content to the notion of nonarbitrary rates, and we therefore turn again to the legislative history. That legislative history suggests that Congress intended teaching hospitals in general, not just those within state borders, to be adequately supported by medicaid plans. See supra at 35.
 
 
 83
 We hesitate, however, at this point to hold that Pennsylvania's refusal to reimburse out-of-state hospitals' DME costs is arbitrary and capricious and in violation of the reasonable and adequate requirement of section 1396a(a)(13)(A). We remain fully cognizant of the states' freedom to experiment with their reimbursement systems, and do not want unnecessarily to restrict it. Instead, withholding judgment on this aspect of the plan individually, we examine the plan as a whole.
 
 
 84
 Under Pennsylvania's plan, WVUH receives reimbursement for operating costs at the average rate of payment for all in-state hospitals (or based on the Hospital's actual charges, whichever is lower), notwithstanding WVUH's character as a teaching hospital that provides tertiary care and serves a disproportionate number of low income patients. Moreover, simply because WVUH is not an in-state hospital, it receives absolutely no DME cost reimbursement. Finally, unlike in-state hospitals, WVUH's is reimbursed for its capital costs on the basis of a rate the bears no relationship to its actual costs. Pennsylvania reimburses its in-state hospitals on the basis of a ten-year phase-in plan that pays in-state hospitals for their actual capital costs on a decreasing percentage basis. After the ten years, a uniform flat rate will apply. Contrast that system with the out-of-state reimbursement. Capital cost reimbursement to out-of-state hospitals consists of an "add-on" that represents the average capital costs of all in-state hospitals, with no adjustment for out-of-state hospitals' actual costs. And out-of-state hospitals do not enjoy the benefit of a ten-year phase-in to adjust to the flat payment rate. WVUH is particularly distressed by the capital cost reimbursement system because it recently opened a replacement facility which greatly increased its capital costs.
 
 
 85
 As we note above, the district court found that this dual reimbursement system resulted in in-state hospitals on the average receiving approximately ninety-five percent of their costs in treating a Pennsylvania medicaid recipient, but WVUH is reimbursed only about fifty-four percent. Now, even if we were to conclude that it is not per se arbitrary and capricious to reimburse out-of-state hospitals on the basis of a flat in-state hospital average, or to reimburse out-of-state hospitals on a different (and presumably, here, lower) scale for capital costs, or not to reimburse them their DME costs at all, there still seems to be something seriously wrong with this reimbursement system. Can the zone of reasonableness possibly be so large as to encompass percentages of cost reimbursement for Pennsylvania medicaid recipients ranging from fifty-four to ninety-five?
 
 
 86
 The HCFA, in declining to define certain statutory terms, stated that "the State's methods and standards implicitly act as the State's definition of an efficiently and economically operated facility." 48 Fed.Reg. 56,046, 56,049 (Dec. 19, 1983). To some extent, the same is true of the term "reasonable and adequate." Pennsylvania, by virtue of the federal statute and regulations, holds its in-state program out as reasonably and adequately reimbursing efficiently operated hospitals. At the same time, however, Pennsylvania impliedly makes the same assertion with respect to its fifty-four percent reimbursement of medicaid costs incurred by an out-of-state tertiary hospital. Our role is to determine whether Pennsylvania can nonarbitrarily make that assertion.
 
 
 87
 In the face of such great disparity in its reimbursement rates between its in-state hospitals and WVUH, Pennsylvania must show a rational basis for its medicaid reimbursement program. As other courts have explained, a "state must articulate a 'rational connection between the facts found and the choice made.' " Colorado Health Care Ass'n, 842 F.2d at 1167 (quoting Baltimore Gas & Elec. Co. v. Natural Resources Defense Council, Inc., 462 U.S. 87, 105, 103 S.Ct. 2246, 2256, 76 L.Ed.2d 437 (1983)). Pennsylvania, we conclude, wholly fails to offer such a rational basis.
 
 
 88
 Pennsylvania's preference of its own hospitals does not justify undercompensating out-of-state hospitals that are serving Pennsylvania patients under a federal program. The State is not merely exercising discretion in how to spend its own money; medicaid funds derive in large part from the federal government. Nothing in Title XIX remotely suggests that a state may use federal funds to give its own hospitals preferential treatment and, at the same time, disadvantage out-of-state hospitals. In establishing the new federal standards for hospital reimbursement rates in section 1396(a)(13)(A), OBRA's legislative history notes that although the Committee recognized that the current economic constraints and need for reductions in federal funds for medicaid requires that states be given the flexibility necessary to improve the medicaid reimbursement mechanism, "the Committee does not want such policies to result in arbitrary and unduly low reimbursement levels for hospital services." H.R.Rep. No. 158, 97th Cong., 1st Sess. 293-94 (1981). Nothing in section 1396a(a) speaks in terms of a dichotomy in rate reimbursement built on state boundary lines; it nowhere suggests that state boundary lines act as points of demarcation in reimbursement for the delivery of health care. Under the federal regulations, supra at n. 6, state boundary lines, except for administrative responsibility, bear an insignificant role, if any, with respect to the actual delivery of health care in a program designed on a national level to aid the poor in a highly mobile society.
 
 
 89
 Moreover, Pennsylvania's excuse of administrative burden does not, in this case, provide a rational basis for WVUH's grossly diminished reimbursement rates. Pennsylvania argues that it would be too time and resource consuming to account for the characteristics and costs of out-of-state hospitals, and that deriving flat rates from the universe of in-state hospitals and applying them to out-of-state hospitals provides a reasonable solution. Although this argument may become valid at some point, it is not valid in this case. WVUH undisputedly is the largest out-of-state provider of health care to Pennsylvania medicaid patients. It serves more of these Pennsylvania patients than over half of the Pennsylvania hospitals. Although we do not suggest that audits and calculations be made for all out-of-state hospitals, the retrieval and evaluation of relevant information from WVUH, and other significant out-of-state providers,[8] would not pose any particular administrative burden. It is simply irrational and arbitrary, not too mention patently unfair, to refuse to do so when the result is a system that varies so wildly in its reimbursement rates for hospitals whose "[m]edical services are needed," 42 C.F.R. Sec. 431.52(b), to serve Pennsylvanians. We therefore conclude that the Pennsylvania medicaid program as it applies to WVUH is violative of federal law because it fails to meet the reasonable and adequate requirement of section 1396a(a)(13)(A).
 
 
 90
 We neither hold nor suggest that Pennsylvania must apply precisely the same methodology to WVUH and other out-of-state hospitals as it does for its in-state hospitals if there is a rational basis for a departure. The methodology applied, however, must be rational, not arbitrary or whimsical. Nor do we suggest that Pennsylvania is precluded from formulating an acceptable reimbursement system to out-of-state hospitals without empirical evidence concerning their historical costs of operation so long as its reimbursement rates fall within the range of "rates reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities."
 
 
 91
 Finally, although not necessary to the outcome of the case given the preceding discussion, we hold that in addition to the substantive provisions Pennsylvania violated the procedural requirements of Title XIX. The three federal provisions discussed above contain both a procedural and a substantive dimension. The procedural dimension is explicit in the federal regulations implementing section 1396a(a)(13)(A). These federal regulations condition HCFA approval of a new state plan on the state's assurances that it has complied with the regulatory requirements. 42 C.F.R. Sec. 447.253 (1988). One of these regulatory requirements is that the State make findings in support of its change in medicaid plan. Essentially, the State is required to find that its new plan complies with the three substantive requirements discussed above. Section 447.253(b) of the HCFA regulations provides:
 
 
 92
 (b) Findings. Whenever the Medicaid agency makes a change in its methods and standards, but not less often than annually, the agency must make the following findings:
 
 
 93
 (1) Payment rates. (i) The Medicaid agency pays for inpatient hospital services and long-term care facility services through the use of rates that are reasonable and adequate to meet the costs that must be incurred by efficiently and economically operated providers to provide services in conformity with applicable State and Federal laws, regulations, and quality and safety standards.
 
 
 94
 (ii) With respect to inpatient hospital services--
 
 
 95
 (A) The methods and standards used to determine payment rates take into account the situation of hospitals which serve a disproportionate number of low income patients with special needs; [and]
 
 
 96
 * * *
 
 
 97
 * * *
 
 
 98
 (C) The payment rates are adequate to assure that recipients have reasonable access, taking into account geographic location and reasonable travel time, to inpatient hospital services of adequate quality.
 
 
 99
 42 C.F.R. Sec. 447.253(b) (1988).
 
 
 100
 In structuring its out-of-state reimbursement program, Pennsylvania admits to gathering no information with respect to these hospitals' actual costs. No empirical analysis was conducted to measure the effects of the reimbursement program on out-of-state hospitals. Pennsylvania did not even identify its large out-of-state providers. Federal law is not satisfied if a state merely makes conceptual policy decisions. A policy predicated upon provincialism and self-interest, not upon findings of reasonableness and adequacy, is unacceptable. We hold that the federal regulations unambiguously require the State to make findings, and in so doing they do not distinguish between out-of-state and in-state hospitals. In failing to make these requisite findings, Pennsylvania violated federal law.[9]
 
 
 101
 V. THE VALIDITY OF THE ADMINISTRATIVE APPEALS SYSTEM
 
 
 102
 Our last inquiry with respect to Pennsylvania's medicaid program is whether the district court correctly concluded that the program's administrative appeals system is legally inadequate. For our answer, we must again look to section 1396a and its implementing regulations to ascertain whether Pennsylvania comports with federal law.
 
 
 103
 Title XIX requires states participating in the medicaid program to institute an appeals procedure by which providers may challenge their payment rates. 42 U.S.C. Sec. 1396a(a)(37) (West Supp.1989); 42 C.F.R. Sec. 447.253(c). The federal regulation states:
 
 
 104
 Provider appeals. The Medicaid agency must provide an appeals or exception procedure that allows individual providers an opportunity to submit additional evidence and receive prompt administrative review, with respect to such issues as the agency determines appropriate, of payment rates.
 
 
 105
 42 C.F.R. Sec. 447.253(c). It is undisputed that, at least at the hearing level, Pennsylvania's appeals procedure allows providers to challenge their payment rates on the ground of the application of the state's reimbursement methodology; it does not allow providers to challenge the validity of the methodology itself. See 701 F.Supp. at 510 (finding of fact # 197). The district court, after review of the federal regulation and the relevant legislative history, held that this procedure was insufficient.
 
 
 106
 Our review of the federal law, however, leads us to conclude otherwise. On September 30, 1981, the HCFA published interim final regulations. 46 Fed.Reg. 47964-47973. Because "individual facility rates will not receive Federal review under the revised regulations," the HCFA required in one of its regulations that states participating in the medicaid program develop an appeals procedure by which individual facilities could request review and adjustment of their rates. The regulation stated:
 
 
 107
 The agency must provide an appeals procedure that allows individual providers an opportunity to submit additional evidence and request prompt administrative review of payment rates.
 
 
 108
 Fed.Reg. p. 47972. The HCFA noted, however, that it was open to suggestions on how best to guarantee review of payment rates and it invited comments on its provider appeals regulation.
 
 
 109
 Some two years later, the HCFA reviewed the comments it received and promulgated the final regulation quoted above. In its accompanying commentary, the HCFA rejected suggestions that it establish minimum criteria defining the scope of review of payment rates. The agency wrote:
 
 
 110
 We also believe that establishing minimum criteria for appeals and penalty clauses for frivolous appeals in the regulation would be contrary to the statutory intent allowing States greater flexibility in developing more cost effective reimbursement systems. Moreover, the States, not the Federal government, are in the best position to determine the administrative process that would best meet their needs and be most compatible with their reimbursement system. However, States are free to establish reasonable criteria for appeals to limit the issues on appeal that may be appropriate or to adopt other procedures to prevent frivolous appeals.
 
 
 111
 48 Fed.Reg. 56046, 56052 (Dec. 19, 1983). Consistent with the hands-off philosophy reflected in this commentary, the HCFA rewrote the appeals regulation to require an appeals procedure for payment rates "with respect to such issues as the agency determines appropriate." 42 C.F.R. Sec. 447.253(c).
 
 
 112
 We believe that this permissive language giving the agency greater authority to select the issues for determination permits the state agency to reject review of challenges to the validity of its methodology in its administrative appeals system. In the situation of a uniform rate, which describes Pennsylvania's reimbursement of out-of-state hospitals, such a limited appeals system may not seem the best approach. See Mary Washington Hosp., Inc. v. Fisher, 635 F.Supp. 891, 903 (E.D.Va.1985) (observing that "the more general the rate-setting system is, the stronger the need for some appropriate method of accommodating particular situations that the general rules do not adequately address."). However, we conclude that the language of the federal regulation, in keeping with the federal policy to contain health costs and give states great flexibility in the administering of medicaid, reserves to the judgment of the states the decision whether to allow challenges to the validity of the methodology at the administrative level.
 
 
 113
 By so holding, we do not mean to imply that the language licenses the states to virtually eliminate all appeals by choosing to deem no issues appropriate for appeal. Implicit in the regulation is, we believe, a requirement that at least correct calculation of the payment rate is a mandatory issue for appeal. In this respect, it is significant that the HCFA rejected a suggestion that the appeals process requirement be waived in states adopting uniform statewide reimbursement rates. 48 Fed.Reg. 56052. By requiring an appeals procedure even in that situation, the regulation appears to contemplate that at least some issue is appealable, and the logical conclusion is that the essential and dominant appealable issue is rate calculation. Pennsylvania allows appeals by providers pursuant to 1 Pa.Code Secs. 35.1-35.251. Canonsburg Gen. Hosp. v. Department of Health, 492 Pa. 68, 422 A.2d 141 (1980). Appeals raising the incorrect calculation of the rate may be appealed from a hearing officer's determination to the Director of OHA or the Secretary of the Department and then to the Commonwealth Court. See Northwestern Inst. of Psychiatry v. Commonwealth, 99 Pa.Cmwlth. 213, 513 A.2d 495, 498 (1986); Grand Oak Nursing Home v. Commonwealth, 116 Pa.Cmwlth. 453, 541 A.2d 800, 802 (1986).
 
 
 114
 We conclude that the federal regulation requires no more of the State's appeals procedure than Pennsylvania offers. We reverse therefore the district court's judgment invalidating Pennsylvania's appeals system.[10]
 
 
 115
 VI. EXPERT WITNESS FEES UNDER 42 U.S.C. Sec. 1988
 
 
 116
 After its decision on the merits, the district court in an exercise of its discretion under 42 U.S.C. Sec. 1988[11] awarded attorneys fees to WVUH as the prevailing party in a section 1983 action. Following the parties' joint proposal on the amount of fees, the court awarded the Hospital $500,000. Of this amount $350,000 was allocated to attorneys fees, $45,867 to disbursements, and $104,133 to expert witness fees. The defendants unsuccessfully contested the award of expert witness fees before the district court, arguing that such fees are statutorily limited to thirty dollars a day by 28 U.S.C. Sec. 1821(b). On appeal the defendants do not challenge an award of expert witness fees in general, but they do renew their argument that the amount of expert witness fees improperly exceeded the statutory maximum.
 
 
 117
 The defendants' argument rests on the Supreme Court's decision in Crawford Fitting Co. v. J.T. Gibbons, Inc., 482 U.S. 437, 107 S.Ct. 2494, 96 L.Ed.2d 385 (1987). In Crawford Fitting the Court held that a federal court taxing expert witness fees as costs under Fed.R.Civ.P. 54(d) could not exceed the statutory maximum of thirty dollars a day contained in 28 U.S.C. Sec. 1821(b). The statutory framework underlying that decision is as follows. Rule 54(d) provides that costs shall be taxed against the losing party unless the court otherwise directs. The modern day codification of the 1853 Fee Act, 28 U.S.C. Sec. 1920, in turn enumerates the various costs that may be assessed against a party, and these costs include "[f]ees and disbursements for printing and witnesses." Another statute, 28 U.S.C. Sec. 1821(b), sets the amount of compensation to be paid witnesses at thirty dollars a day.[12]
 
 
 118
 The petitioners in Crawford Fitting argued that federal courts had discretion under Rule 54(d) to award costs above and beyond those listed in section 1920 and in excess of the amount provided in section 1821. The Court rejected petitioners' contention, concluding that their view of Rule 54(d) as authorizing courts to decide what is taxable as a cost would render section 1920 superfluous. 482 U.S. at 441, 107 S.Ct. at 2497. Thus, because section 1920 listed witness fees as a taxable cost, and because section 1821(b) authorized witness compensation of only thirty dollars a day, the Court held that expert witness fees taxed as costs against the losing party under Rule 54(d) could not exceed section 1821(b)'s statutory cap. 482 U.S. at 445, 107 S.Ct. at 2499.
 
 
 119
 The defendants ask us to apply Crawford Fitting to expert witness fees awarded as part of an attorneys fee under 48 U.S.C. Sec. 1988. They assert that the broad ruling of Crawford Fitting precludes awarding of expert witness fees in excess of thirty dollars a day, even though those fees are assessed as part of an attorneys fee under the fee-shifting statute of section 1988 rather than as a run-of-the-mill cost taxed as of course in favor of the prevailing party under Rule 54(d). The Hospital, on the other hand, argues that Crawford Fitting 's reach does not extend to section 1988, and that expert witness fees assessed under that section are not subject to a statutory cap.
 
 
 120
 Section 1988 is a statutory exception to the general American Rule disallowing shifting of attorneys fees. Applicable in civil rights cases, the statute states that a court may award to the prevailing party "a reasonable attorney's fee as part of the costs." In construing section 1988, courts developed the general principle that incidental expenses incurred by the attorney, and not usually absorbed as overhead but rather charged to the client, may be included as part of an "attorney's fee" under section 1988. See Bartell, Taxation of Costs and Awards of Expenses in Federal Court, 101 F.R.D. 553, 592-94 (gathering cases).
 
 
 121
 Depending on the law of the circuit, the "expenses" allowable as part of an attorneys fee have sometimes included expert witness fees. See Ramos v. Lamm, 713 F.2d 546, 559 (10th Cir.1983) (expert witness fees reimburseable under section 1988 if "reasonably necessary" to case); Heiar v. Crawford County, 746 F.2d 1190, 1203 (7th Cir.1984) (expenses of litigation "distinct from either statutory costs or the costs of the lawyer's time reflected in his hourly billing rates," including expert witness fees, are part of attorneys fee under section 1988). But see Wheeler v. Durham City Bd. of Educ., 585 F.2d 618, 624 (4th Cir.1978) (fees of expert witnesses "are traditionally not regarded as attorney's fees," however essential their services to the successful preparation and trial of a complex case). In our own circuit, we have followed the rule, not limited to civil rights cases but certainly applicable in a section 1988 case, that a district court has the equitable discretion to award expert witness fees in excess of the section 1821 statutory amount if "the expert's testimony is indispensable to determination of the case." See Roberts v. S.S. Kyriakoula D. Lemos, 651 F.2d 201, 206 (3d Cir.1981); see also Rank v. Balshy, 590 F.Supp. 787, 801 (M.D.Pa.1984) (expert witness fees allowable as part of attorneys fee under section 1988 in excess of thirty dollars a day).
 
 
 122
 The Hospital and the defendants stipulated that WVUH's experts were indispensable to the case, and the district court independently expressed its heavy reliance on their testimony. Under the rule in this circuit, WVUH normally would be entitled to expert witness fees in excess of the statutory maximum. The issue before us, however, is whether Crawford Fitting repudiates the previous law with respect to enhanced awards of expert witness fees under section 1988.
 
 
 123
 The Hospital argues, and the district court agreed, that Crawford Fitting does not apply to fees awarded under section 1988. The argument has much merit. Justice Blackmun, concurring in Crawford Fitting, and Justices Marshall and Brennan, dissenting, all emphasized that the Court in that case did not reach the question whether a court may award excess expert witness fees under section 1988. 482 U.S. at 445, 107 S.Ct. at 2499 (Blackmun, J., concurring); id. at 446 n. 1, 107 S.Ct. at 2500 n. 1 (Marshall, J., dissenting). Moreover, the policy underlying section 1988, that of making the prevailing party whole, would suggest that the rule of cost taxation embodied in Crawford Fitting should not apply in the context of attorneys fee shifting in civil rights actions. In his strong concurrence in International Woodworkers v. Champion Int'l. Corp., 790 F.2d 1174, 1181-93 (5th Cir.1986), aff'd sub nom. Crawford Fitting Co. v. J.T. Gibbons, Inc., 482 U.S. 437, 107 S.Ct. 2494, 96 L.Ed.2d 385 (1987), Judge Rubin makes the forceful argument that based on the legislative history of the Civil Rights Attorney's Fees Awards Act of 1976, Congress intended to treat expert witness fees like all other litigation expenses and include them as part of the attorneys fee awardable under section 1988.
 
 
 124
 Indeed, a number of courts examining the question raised here have concluded that Crawford Fitting does not limit expert witness fee awards under section 1988 to the rate set in section 1821(b).[13]
 
 
 125
 On the other hand, the broad language of Crawford Fitting strongly suggests that we reach the opposite conclusion. Although on its facts a Rule 54(d) case, the substance and reasoning in Crawford Fitting seems to dictate that, even in the case of a fee shifting statute such as section 1988, a court may not award fees in excess of the statutory maximum of thirty dollars a day unless the fee shifting statute expressly makes such an allowance. The Court wrote that it "will not lightly infer that Congress has repealed Secs. 1920 and 1821, either through Rule 54(d) or any other provision not referring explicitly to witness fees." 482 U.S. at 445, 107 S.Ct. at 2499. Moreover, the Court plainly expressed its disfavor for "[a]ny argument that a federal court is empowered to exceed the limitations explicitly set out in sections 1920 and 1821 without plain evidence of congressional intent to supersede that section." Id. at 445, 107 S.Ct. at 2499.
 
 
 126
 We believe that the recent decision of the Court in Missouri v. Jenkins, --- U.S. ----, 109 S.Ct. 2463, 105 L.Ed.2d 229 (1989), in no way alters the ruling of the Court in Crawford. Unlike Crawford, which dealt with witness fees statutorily fixed by Congress as part of the costs, the Court in Jenkins dealt with a comparatively new phenomenon in the legal world, the enhancement of attorney's fees by including the fees for services of paralegals and law clerks. Their fees, however, are not regulated by statute as are witness fees. In fact, Missouri, against whom the fees were taxed, conceded "that compensation for the cost of these personnel should be included in the fee award." Id. at ----, 109 S.Ct. at 2469. Missouri's argument was that section 1988 did not authorize billing paralegals at market rates, but only at their cost to the attorneys hiring them; charging market rates produced a windfall for the attorney.
 
 
 127
 We acknowledge that in this age of sophisticated litigation, in which expert witnesses play an increasingly important role, thirty dollars per day is an insignificant sum. However, we believe that we are constrained by the language of Crawford to abandon our previous rule and to limit expert witness fees to thirty dollars a day. Congress has chosen to legislate in this area and unless the statute under which expert witness fees are awarded expressly repeals the limits of sections 1920 and 1821(b), we must defer to legislative fiat. In so holding, we join with the other circuits interpreting Crawford Fitting that have arrived at the same conclusion with respect to fee-shifting statutes similar to section 1988. Denny v. Westfield State College, 880 F.2d 1465 (1st Cir.1989) (holding in a Title VII sex discrimination case that absent some reasonably explicit indication of Congressional intent that witness fees be shifted without regard to the thirty dollars per day cap, the Crawford rule must prevail). See Glenn v. General Motors Corp., 841 F.2d 1567, 1575 (11th Cir.), cert. denied, --- U.S. ----, 109 S.Ct. 378, 102 L.Ed.2d 367 (1988) (holding section 1821 applicable to fee-shifting provision of Equal Pay Act because "the broad language in Crawford Fitting does not permit a distinction based upon whether or not the award is made under a fee-shifting statute"); Leroy v. City of Houston, 831 F.2d 576, 584 (5th Cir.1987), cert. denied, --- U.S. ----, 108 S.Ct. 1735, 100 L.Ed.2d 199 (1988) (holding section 1821 applicable to fee-shifting provision of Voting Rights Act); cf. Gilbert v. City of Little Rock, 867 F.2d 1062, 1062-63 (8th Cir.1989), petition for cert. filed (May 20, 1989) (en banc ) (affirming by an equally divided court the order of the district court awarding expert witness fees as expenses under section 1988 at the statutory rate of thirty dollars a day); Boring v. Kozakiewicz, 833 F.2d 468, 474 (3d Cir.1987), cert. denied, --- U.S. ----, 108 S.Ct. 1298, 99 L.Ed.2d 508 (1988), (stating in dicta that under Crawford Fitting "[a] prevailing party in a civil rights case is not entitled to tax such fees as costs"); see also Central Delaware Branch of NAACP v. City of Dover, 123 F.R.D. 85, 94-95 (D.Del.1988) (awarding expert witness fees under section 1988 at statutory rate of thirty dollars a day).
 
 
 128
 We thus conclude that, under Crawford Fitting, section 1988 as presently drafted does not authorize expert fee awards in excess of the statutory cap of thirty dollars per day provided in section 1821(b). We therefore vacate the district court's judgment awarding attorneys fees insofar as it awards WVUH expert witness fees in excess of thirty dollars per day.
 
 VII. CONCLUSION
 
 129
 We conclude that WVUH can assert a cause of action against the defendants under 42 U.S.C. Sec. 1983 for violation of the federal medicaid statute and that statute does not reflect a congressional intent to foreclose private enforcement. Although states possess broad discretion in devising their hospital reimbursement plans under the medicaid statute, we hold that overall the Pennsylvania medicaid program as it applies to WVUH violates federal law because it fails to meet the disproportionate share and the reasonable and adequate requirements of section 1396(a)(13)(A) and the procedural provisions of Title XIX.
 
 
 130
 As for Pennsylvania's administrative appeals system, we conclude that it sufficiently satisfies Title XIX and the implementing federal regulation. Finally, the district court's award of expert fees in excess of thirty dollars per day exceeded federal statutory provisions.
 
 
 131
 Accordingly, the judgment of the district court declaring the Commonwealth of Pennsylvania's medicaid prospective system as it applies to WVUH in violation of federal law will be affirmed as well as its order directing the defendants to formulate a methodology within ninety days from the day of judgment for its medicaid prospective payment system for WVUH consistent with and in conformity with federal law. Reimbursement to WVUH under a prospective payment system that conforms to federal law will commence with the date of the district court's initial judgment in this matter. The judgment of the district court declaring Pennsylvania's administrative appeals system as it applies to WVUH in violation of federal law will be reversed. The judgment of the district court with respect to attorney's fees will be vacated insofar as it grants expert witness fees in excess of thirty dollars per day.
 
 
 132
 Two-thirds of WVUH's costs on appeal will be taxed against the appellants.
 
 
 
 [1]
 WVUH in its supplemental brief urges us to apply the test articulated in Cort v. Ash, 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), for determining whether a statute implies a private right of action. The Hospital should be happy that we refuse its request and instead apply the traditional, and, coincidentally for it, more favorable analysis to determine private enforceability under Sec. 1983. Whether a federal statute is enforceable under Sec. 1983 and whether the statute creates an implied right of action involve separate inquiries. See, e.g., Middlesex Cty. Sewerage Auth. v. National Sea Clammers Ass'n, 453 U.S. 1, 19, 101 S.Ct. 2615, 2625, 69 L.Ed.2d 435 (1981)
 For the sake of clarity, we briefly explain the difference between a Sec. 1983 private right of action analysis and the general implied right of action analysis of Cort v. Ash. When a statute does not explicitly supply a private right of action, two occasionally intersecting avenues may be explored for a possible private right of enforcement. First, an implied private right of action to enforce the statute may exist directly under the statute in accordance with the four-factor analysis of Cort v. Ash. To establish an implied right of action under Cort v. Ash, the plaintiff must satisfy the first requirement--that the statute creates a federal right in favor of the plaintiff. The plaintiff must then satisfy the three remaining Cort v. Ash requirements relating to the existence of a remedy--that Congress intended to create a remedy, that the remedy is consistent with the legislative scheme, and that the cause of action is not traditionally relegated to state law. In sum, under Cort v. Ash the plaintiff bears the burden of establishing not only the existence of a right, but also the existence of an intended private remedy.
 In appropriate cases, the second avenue for private enforcement of a federal statute is Sec. 1983. In determining whether a private right of action exists under Sec. 1983, only two inquiries are relevant: one, whether the statute alleged to have been violated creates a federal right in favor of the plaintiff, and the other, whether Congress has foreclosed the remedy of private enforcement. The Sec. 1983 analysis intersects with the Cort v. Ash analysis insofar as the plaintiff under both analyses must establish the creation of a federal right. With respect to the existence of a remedy, however, the contrast between the two analyses is stark. Under Cort v. Ash the plaintiff must establish that Congress intended the remedy. Under Sec. 1983 analysis, on the other hand, once a federal right is established, the existence of a remedy is presumed because Sec. 1983 itself provides the authorization for private enforcement. The burden is on the defendant to establish that Congress intended to foreclose private enforcement.
 
 
 [2]
 We note that exhaustion of state administrative remedies is not a prerequisite to an action under Sec. 1983. Robinson v. Block, 869 F.2d 202, 207 n. 5 (3d Cir.1989)
 
 
 [3]
 At oral argument before us the following colloquy occurred between the court and counsel for the State:
 MR. FOERSTER: And the assumption was made that we had no evidence to the contrary, and still haven't, that the experience out-of-state as a whole is any different from the experience in state; that these hospitals would have about the same amount of medicaid utilization as does the average in-state hospital.
 THE COURT: If that's true, then why shouldn't West Virginia Hospital be factored in on the same basis as the Pennsylvania hospitals?
 MR. FOERSTER: Again I could only go back to what I answered before, the considerations that keep the money in-state, the treatment in-state, the marketing too.
 Tr. 19-20.
 
 
 [4]
 The district court found as a fact that in both fiscal years 1984-1985 and 1985-1986, WVUH treated in excess of 800 Pennsylvania medicaid patients. In fiscal year 1986-1987, it treated approximately 730 Pennsylvania medicaid patients. WVUH provided more care to Pennsylvania medicaid residents than over one-half of the in-state hospitals for fiscal years ending June 10, 1986, and fiscal year ending June 30, 1987
 
 
 [5]
 42 C.F.R. Sec. 431.52(b) requires that a state plan must provide that the State will furnish medicaid to: "(1) A recipient who is a recipient of the State while that recipient is in another State, to the same extent that medicaid is furnished to residents in the State," when the recipient meets certain prescribed conditions or "[i]t is general practice for recipients in a particular locality to use medical resources in another State."
 
 
 [6]
 The defendants have not asserted that WVUH is not an "efficiently and economically operated" facility
 
 
 [7]
 The district court observed that some 7% of WVUH residents practice in Pennsylvania. Moreover, as the district court observed, some of the residents in Pennsylvania teaching hospitals will practice out of state, yet Pennsylvania's program helps finance their training
 
 
 [8]
 The district court found that Pennsylvania could audit 75-100 more hospitals each year without increasing its audit staff
 
 
 [9]
 The district court held that Pennsylvania's out-of-state reimbursement program violated not only Title XIX, but also the equal protection rights of WVUH guaranteed by the fourteenth amendment. Although we have serious reservations concerning this treatment of the equal protection rights issue by the district court, we dispose of this case on statutory grounds and therefore see no need to reach the constitutional issue
 
 
 [10]
 In light of our disposition with respect to the administrative appeals procedure, we have no cause to consider the eleventh amendment issue raised in the district court and pursued on appeal. The district court's judgment ordering Pennsylvania to revise its appeals procedure and to apply it to WVUH for reimbursement claims dating from the commencement of this action raised serious eleventh amendment concerns about whether this remedy was retroactive relief unavailable against the state in federal court. Because we uphold the appeals system and issue only prospective relief from the day of judgment, the eleventh amendment is not implicated by our decision
 
 
 [11]
 Section 1988 provides in pertinent part:
 In any action or proceeding to enforce a provision of [section 1983], the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs.
 42 U.S.C.A. Sec. 1988 (West 1981).
 
 
 [12]
 Section 1821 provides in relevant part:
 (a)(1) Except as otherwise provided by law, a witness in attendance at any court of the United States ... shall be paid the fees and allowances provided by this section.
 * * *
 (b) A witness shall be paid an attendance fee of $30 per day for each day's attendance. A witness shall also be paid the attendance fee for the time necessarily occupied in going to and returning from the place of attendance at the beginning and end of such attendance or at any time during such attendance....
 28 U.S.C.A. Sec. 1821 (West Supp.1989).
 
 
 [13]
 See Sapanajin v. Gunter, 857 F.2d 463, 465 (8th Cir.1988) (holding that because expert witness fee award was not made as a taxation of costs under section 1821 but as an expense under section 1988, the cap on fees set out in Crawford Fitting does not apply); Black Grievance Comm. v. Philadelphia Elec. Co., 690 F.Supp. 1393, 1403 (E.D.Pa.1988) (same); Hillburn v. Comm'r of Conn. Dep't of Income Maintenance, 683 F.Supp. 23, 27 (D.Conn.1987), aff'd, 847 F.2d 835 (2d Cir.1988) (same); United States v. Yonkers Bd. of Educ., 118 F.R.D. 326, 330 (S.D.N.Y.1987) (same); cf. Mathis v. Spears, 857 F.2d 749, 758-59 (Fed.Cir.1988) (post-Crawford case holding section 1821 inapplicable to award of expert witness expenses under fee-shifting statute pertaining to patents); Freeman v. Package Machinery Co., 865 F.2d 1331, 1346-47 (1st Cir.1988) (although not reaching issue, strongly suggesting it would not "elongate" Crawford Fitting to apply in context of express fee shifting statute)