OPINION OF THE COURT
John G. Connor, J.
Pursuant to article 14 of the Civil Service Law entitled "Public Employees’ Fair Employment Act”, petitioners ask to enjoin the respondents from carrying out an alternative payment plan whereby certain court employees’ wages are withheld. Petitioners are the collective bargaining representatives to the State court employees.
Petitioners seek to declare that the legislation passed at a 1990 regular session, withholding wages of the nonjudicial employees, is in violation of the State Constitution and contrary to State law. (Civil Service Law § 200.)
*301 Laws of 1990 (ch 190) affects only those nonjudicial employees who have been hired since 1982.
The attorney for respondent Matthew T. Crosson maintains that those employees hired since 1982 have no reason to complain since other workers were lagged previously. Section 5 of Laws of 1982 (ch 353) was passed subsequent to an agreement between the bargaining unit and Unified Court System.[1]
The employees whose wages are now being withheld pursuant to Laws of 1990 (ch 190, § 375) have had no opportunity to negotiate with the Office of Court Administration prior to their wages being lagged.[2]
Chapter 190 provides that wages for 14 days are withheld on all nonjudicial employees hired since 1982. Under the proposed withholding, wages earned every ninth day for a total of 14 days are withheld, instead of every 10th day, as bargained for under the 1982 bargaining agreement.
Petitioners contend that the lag provisions as passed at a regular session are in violation of the New York State Constitution and contrary to unfair labor practices and the right to collectively bargain under the State’s Taylor Law. Petitioners allege that a change in the payment of salaries from 1 for 10 working days to 1 for 9 working days may be implemented only after good-faith negotiations.
Section 209-a (1) of the Civil Service Law, entitled "Improper employer practices; improper employee organization practices; application”, prescribes: "It shall be an improper practice for a public employer or its agents deliberately * * * (d) to refuse to negotiate in good faith with the duly recog *302 nized or entitled representatives of its public employees; or (e) to refuse to continue all the terms of an expired agreement until a new agreement is negotiated”.
The Chief Administrator as the public employer has the obligation to negotiate in good faith with petitioners.
The Chief Administrator places the blame at the footsteps of the legislative branch (New York State Legislature) for implementing the new pay lag.[3] Petitioners’ rights as guaranteed under the Civil Service Law have therefore been preempted by the enactment of Laws of 1990 (ch 190).
The State legislative branch unquestionably has the delegated authority to make those appropriations necessary to meet payment of public employees’ wages. Section 204-a (1) of the Civil Service Law provides: " 'that legislative action is needed before the agreement becomes effective as to those provisions requiring legislative approval such as, for example, the appropriation of funds for salaries.’ ”[4] The State Legislature’s approval of the method of wage payments in 1982 takes precedence over the provisions set forth in Laws of 1990 (ch 190). Why a subsequent legislative body may by amendment nullify a previous contractual debt of the State is beyond comprehension. The State having made those appropriations as to the period covering the method of payments may not subsequently cancel a contractual obligation.
As a public employer the legislative body is subject to certain constitutional restraints. For a full discussion see Befort, Public Sector Bargaining: Fiscal Crisis and Unilateral Change (69 Minn L Rev 1221 [1985]).[5]
*303 Respondents rely upon Matter of Subway-Surface Supervisors Assn. v New York City Tr. Auth. (44 NY2d 101) as authority for allowing the Legislature to lag the payroll to those members who have not negotiated with their public employer. In the Subway-Surface case, the Court of Appeals found that a wage freeze on employees of the Transit Authority was necessary to alleviate an existing financial crisis and there was no constitutional infirmity since the wage freeze was "prospective” in nature and dealt with pay increases that had not yet been rendered. The State’s highest court stated (supra, at 113): "Thus, by its terms, FEA effected a limited intrusion on the contract rights * * * there was neither termination of existing employment nor deprivation of payment for services that had been rendered in the past.” At page 114, the court recites: "We would further note, as stated above, that there is a significant and rational difference between impairment of governmental obligations arising out of contracts under which the engagement of the other contracting party is still executory and impairment of those arising out of contracts fully performed.”
Respondents seek to be included within the scope of the Subway-Surface case (supra). The Subway case differs from the facts as presented herein. There is no proclamation in the subject legislation declaring the existence of a financial crisis. In fact Laws of 1990 (ch 190, § 375) is tucked and buried in a number of corporate tax laws disconnected with the lag payroll. The present application and the Subway case are inharmonious. Here the State seizes the employee’s wages indefinitely. Under the Subway case, the payments in the "wage freeze” were extended and the wages were paid.
"wage freeze”
Essential to this action is whether the authorization in lagging the pay of the petitioners may be considered a "wage *304 freeze”. The basic concept as to whether the Legislature may unilaterally withhold wages earned by a public employee, turns on the natural meaning and definition as to what is a "lag payroll”.
Respondents contend the deferral of two weeks’ wages is merely a wage freeze and postpones the timing of the payment by withholding for an indefinite period. Petitioners assert the lag payroll violates article I, § 17 of the NY Constitution. Nowhere is it asserted that the petitioners will be paid for the two weeks’ loss of salary.
"pay lag”
Fundamentally at issue is whether the State may withhold wages of employees without first obtaining their consent. Whether the legislative body may unilaterally withhold wages of a public employee without first providing the public employee an opportunity to negotiate collectively has never been challenged. The concept in confiscating the public employees’ wages to meet the government’s emergency must be crucial and of the highest importance. For an employer to withhold wages and use the employees’ moneys for its own use conflicts with the basic concepts of Labor Law.
To appropriate or withhold by definition is (1) to refrain from giving or granting and (2) to hold back; keep back. Under Laws of 1990 (ch 190) the Comptroller is authorized to withhold 14 days under an existing contract that provides for no lag payments. To "retain” implies to continue to have or hold.
Both the Federal and State Constitutions provide that no State shall deprive any person "of life, liberty, or property, without due process of law”. (US Const, 14th Amend, § 1; NY Const, art I, § 6.) To withhold earnings to be repaid at some future date either upon the employee’s retirement or payable to his or her estate is simply taking the employee’s wage to be used by the public employer as it sees fit. Respondents call it forced savings. Withholding wages without an agreement as to the amount of the return is comparable to depositing money in a shoe box.
To withhold and keep the wages of the working person is repugnant to those rights guaranteed under the State Constitution. Article I, § 17 (entitled "Labor not a commodity; hours and wages in public work; right to organize and bargain collectively”) guarantees the right to organize and to bargain *305 collectively. This cannot be considered a commodity nor an article of commerce.
To take, borrow or withhold the employee’s wages for the employer’s (State’s) use compels the public employee to be the employer’s financier. The primary obligation of the public employer is to first pay those wages that have been earned by the public employee. To infer that it is constitutionally sound to take the public employees’ wages to balance other legal obligations is to disregard the State’s obligation to pay first its own just debts. The semantics in calling such a debt a "lag-pay” is simply a sham.
The employee’s wages to be utilized for the general welfare effectuates a transformation, changing the wage earner from a creditor to a banker. It is a tax designed and structured against the wage earner exclusively, to meet the needs of the general welfare. The financing by lag payments simply is a plan to deprive the workers from receiving their earned income.
Based upon the constitutional provisions guaranteed under the Due Process Clauses of the US and NY Constitutions, section 375 of Laws of 1990 (ch 190) is hereby declared to be unconstitutional. By reason of the above, the petitioners are entitled to their respective payments in compliance with those terms as set forth in Laws of 1982 (ch 353).

. Section 1 of Laws of 1982 (ch 353) states:
"Section 1. The legislature finds that collective bargaining agreements have been negotiated by the unified court system with employee organizations representing nonjudicial officers and employees in the following units: New York State Court Employees Association * * *
"The purpose of this act is to implement these agreements and to provide increases in compensation for nonjudicial officers and employees of the unified court system not in collective negotiating units.”

. A memorandum dated October 31, 1990 addressed to all nonjudicial employees from Matthew T. Crosson states: "By now, no one in the court system could be unaware that earlier this year the Legislature enacted Chapter 190 of the Laws of 1990 Section 375 which imposes a lag payroll on some court system employees. * * * We did not ask the Legislature to impose lag payroll on the court system, and we do not want it. The Legislature did it because of the State’s fiscal problems — anticipating lag payroll, the court system’s budget was cut $7-million this year.”

. Respondent Chief Administrator Crosson’s memorandum of law at page 17 states: "The State Legislature thus expressly removed the implementation of an alternative procedure from the collective bargaining are- » na.

. See Association of Surrogates & Supreme Ct. Reporters v State of New York (749 F Supp 97, 101) in which case were essentially the same facts as presented herein. The court decided "that legislative appropriations are necessary before compensation or salary provisions of collective bargaining agreements become effective.” (Supra, at 101.) Contrary to the District Court’s decision there was an appropriation necessary to meet the terms of the negotiated contract and approved by the 1982 New York State Legislature for those wages now disputed. This occurred in 1982. Laws of 1982 (ch 353, § 5) specifically states such fact. (See, n 1 herein.)

. See, Befort, Public Sector Bargaining: Fiscal Crisis and Unilateral Change, 69 Minn L Rev 1221, 1246 (1985) ("The contract clause is the principal constitutional limitation on the legislature’s authority to modify existing collective bargaining agreements. Although the contract clause
*303 literally proscribes any impairment of contract, the United States Supreme Court has long recognized that a state, in the exercise of its police powers, may protect the public interest in an emergency by the enactment of reasonably tailored legislation.”).
In commenting on United States Trust Co. v New Jersey (431 US 1 [1977]), the Minnesota Law Review article recites: "The impairment of public contracts is constitutional, the Court stated, only if 'reasonable and necessary to serve an important public purpose.’ The Court [Supreme Court] noted that an impairment is 'reasonable’ only if the parties did not foresee at the time of contacting the possibility of changed circumstances and is 'necessary’ only if there are no less drastic alternatives available for safeguarding the public interest.” (Op. cit., at 1247.)