**UNITED CEREBRAL PALSY ASSO-CIATIONS OF NEW YORK STATE, INC., Plaintiff,**

v.

**Mario CUOMO, as Governor of the State of New York, Cesar A. Perales, Commissioner, New York State Department of Social Services, Dall Forsythe, Director, New York State Division of Budget, Elin Howe, Commissioner of New York State Office of Mental Retardation and Developmental Disabilities, Lorna M. Barnette, Commissioner of New York State Department of Health, Defendants.**

No. 91–CV–1438.

United States District Court, N.D. New York.

Feb. 3, 1992.

Steven H. Mosenson, Associations of New York State, Inc. (Glenn M. Rickles, of counsel), New York City, for United Cerebral Palsy.

Proskauer, Rose, Goetz & Mendelson (Edward S. Kornreich, of counsel), New York City, for proposed intervenor/plaintiff St. Luke's–Roosevelt Hosp. Center.

Robert Abrams, Atty. Gen., Dept. of Law (Judith I. Ratner, of counsel), Albany, N.Y., for defendants.

## MEMORANDUM DECISION AND ORDER

CHOLAKIS, District Judge.

This action involves the initiation, by the New York State Department of Social Services ("DSS"), of a "lag" in the reimbursement of Medicaid funds to certain health care providers. Under this "lag," each payment by the State to the providers will be delayed by one day until the payments are ultimately received by the provider two weeks later than had been the practice prior to the implementation of the "lag."

The Medicaid Program, established pursuant to title XIX of the Social Security Act, 42 U.S.C. § 1396 *et seq.*, establishes a joint federal and state cost-sharing system to provide necessary medical services to indigent persons who otherwise would be unable to afford such care. Although a state is not required to participate in the program, it must, once it has decided to so participate, abide by the applicable federal statutory and regulatory scheme.

To become a participant, a State must submit, for approval by the Secretary of Health and Human Services ("HHS"), a plan for medical assistance. This "State Plan"

is a comprehensive written statement submitted by the agency describing the nature and scope of its Medicaid program and giving assurance that it will be administered in conformity with the specific requirements of title XIX, the regulations in this Chapter IV [of the CFR], and other applicable official issuances of the Department.

42 C.F.R. § 430.10 (1990). Once the plan is approved by HHS, the State is entitled to receive reimbursement from the federal government for a percentage of the funds the State pays to certain health care providers for the care provided to Medicaid recipients.

Plaintiff United Cerebral Palsy Associations of New York State, Inc. ("UCPA") is a not-for-profit provider that operates Intermediate Care Facilities ("ICFs") and approximately 70 community residences for the mentally retarded and developmentally disabled, under licenses of the New York State Office of Mental Retardation and Developmental Disabilities ("OMRDD"). UCPA also operates Diagnostic Treatment Centers under licenses of the New York Department of Health ("DOH"). Finally, UCPA provides transportation services to its clients. Although not totally clear from the papers, UCPA and its affiliates appear to serve over 30,000 clients in the State.

Proposed Intervenor St. Lukes–Roosevelt Hospital ("St. Lukes") is a not-for-profit hospital corporation located in Manhattan, with 1,300 patient beds, 6,500 employees, "and hundreds of renowned physicians, residents and medical students." Proposed Intervenor's Complaint par. 5. According to St. Lukes, it is the largest non-governmental provider of care to Medicaid patients in the State, with 40% of its inpatient days paid by Medicaid in 1990. *See id.* par. 8.

Plaintiff UCPA has brought on this Order to Show Cause for a preliminary injunction to prevent the State from continuing the lag. Plaintiff argues that the lag (1) violates the Boren Amendment to the Medicaid Act; (2) constitutes a taking of property without just compensation and without due process; (3) denies plaintiff equal protection; (4) violates other aspects of the federal Medicaid statutory and regulatory scheme; and (5) violates the rulemaking requirements of the N.Y.A.P.A. Proposed Intervenor St. Lukes seeks (1) to intervene; and (2) a preliminary injunction

preventing the continuation of the lag. Oral argument on the Order to Show Cause was held on January 31, 1992, at which time this Court issued an oral ruling denying the motion for an injunction, and informed the parties that this opinion would issue soon thereafter.

*Intervention*

St. Lukes first seeks to intervene as of right and, in the alternative, by permission. Defendant has not opposed this motion. Intervention as of right may be secured

> when the applicant claims an interest relating to the property or transaction which is the subject of the action and the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant's ability to protect that interest, unless the applicant's interest is adequately represented by existing parties.

Fed.R.Civ.P. 24(a)(2).

■ The Second Circuit has held that a proposed intervenor must satisfy four criteria to be allowed to intervene as of right under Rule 24(a)(2). The proposed intervenor must (1) file timely, (2) demonstrate an interest in the action, (3) show an impairment of that interest arising from an unfavorable disposition, and (4) have an interest not otherwise adequately protected. *See United States v. State of New York*, 820 F.2d 554, 556 (2d Cir.1987).

Because this Court finds that St. Lukes has satisfied the four-part test, and because the motion is unopposed, the Court hereby grants the motion to intervene.

*Preliminary Injunction*

■ To obtain a preliminary injunction, the moving party must show (a) irreparable harm, and (b) either likelihood of success on the merits, or a sufficiently serious question going to the merits to make them a fair ground for litigation and a balance of the hardships tipping decidedly toward the party requesting the relief. *See, e.g., The Resolution Trust Corp. v. Elman*, 949 F.2d 624, 626 (2d Cir.1991); *Paulsen v. County of Nassau*, 925 F.2d 65, 68 (2d Cir.1991). A Court's grant or refusal of an interlocutory injunction must set forth the findings of fact and conclusions of law which constitute the grounds for its action. Fed.R.Civ.P. 52(a).

Plaintiff UCPA argues that the "withholding" of one week's payment will result in a loss of $750,000 to UCPA, and $3 million to UCPA and its 25 New York state affiliates and divisions. *See* Parker Aff. par. 23. UCPA contends that the lag will have a devastating impact on special education, clinical, health and other therapeutic services, vocational rehabilitation, residential services, family and community services, etc. *See id.* par. 29. Moreover, UCPA states that, as a result of the "reduction," it will be unable to comply with Medicaid quality control regulations and conditions and standards of participation. *See id.* par. 30. UCPA further asserts that the result of the unavailability of cash "may be closure of residential programs, day treatment programs, recreation programs, and other services, layoff of staff, a lessening of the quality of programs for mentally retarded and developmentally disabled residents of New York State." *Id.* par. 32. Finally, UCPA states that, "because of the uncertainties surrounding the state budget, plaintiff has been unable to secure additional loans from banks. *Id.* par. 31.

St. Lukes predicts similarly dire consequences, stating that each week of "withholding" will result in a loss of $3.4 million. *See* Balko Aff. par. 41. St. Lukes states that, in order to maintain operations, it has already delayed payment to its vendors for 109 days, "the maximum extent possible without being placed on a cash on delivery only payment basis or incurring significant and unreimburseable interest and penalty costs." *Id.* par. 42. Further delay "will force the Hospital to cease to use certain suppliers who provide products that are preferred in patient care." *Id.* par. 43.

In addition, St. Lukes' largest expense, a weekly payroll alternating between $4 and $6 million, cannot be delayed. *See id.* par. 44. St. Lukes further asserts that the "withhold" will force dramatic cuts in services, e.g., further reduction in clinic hours, closure of additional clinics, refusal to treat

clinic patients from outside its service area, and renegotiation or elimination of governmental contracts subsidized by the hospital. *See id.* par. 45. These actions will lead to more layoffs and personnel cutbacks. *See id.* St. Lukes also states that patient access to care will be greatly affected.

Because this Court decides that UCPA and St. Lukes have not demonstrated a likelihood of success on the merits of their claims, the Court will not reach the issue of irreparable harm.

### Boren Amendment

■ The first argument raised by UCPA and St. Lukes is that the lag, repeatedly characterized by them as a "permanent withholding" or a "reduction,"[1] violates the "Boren Amendment" to the Medicaid Act,[2] because the lag constitutes a change in the methods and standards of payment for which the State was required, and failed, to make findings and then make assurances to the Health Care Finance Administration ("HCFA").[3]

In *Pinnacle Nursing Home v. Axelrod*, 928 F.2d 1306 (2d Cir.1991), a case heavily relied upon by both plaintiff and the intervenor, the Second Circuit affirmed that portion of a District Court decision which held that New York's "Adjustment" of a reimbursement methodology was enacted without complying with federally mandated pro-

---

**1.** It is alleged that the lag is a "withholding" because the providers will only get the money due them for those two weeks when "plaintiff or other agencies go out of business." Pl.Mem. at 16; *see also* Parker Aff. par. 24 ("plaintiff would only receive this money if and when it closed its doors and ceased doing business."); Balko Aff. par. 35 ("The hospitals will receive the 'withheld' payments only when they cease to provide Medicaid services—which can only happen when they cease to treat patients."). Intervenor St. Lukes also equates "permanently withhold[ing] payments" with "pay[ing] less than anticipated." Proposed Intervenor's Mem. at 21.

The lag is characterized as a "reduction" by asserting that, since the providers will receive only 50 checks for 52 weeks of service for the fiscal year, the actual rate of payment is thereby "reduced." *See, e.g.,* Proposed Intervenor's Mem. at 43 ("the permanent withholding will effect a 4% reduction in the reimbursement rates for 1992"); *id.* at 41–42 n. 14 ("[T]he State is ... requiring health care providers to provide services for which the reimbursement rate would be zero.").

**2.** Under the relevant portion of the statute, a state plan under Medicaid must provide

for payment ... of the hospital services, nursing facility services, and services in an intermediate care facility for the mentally retarded provided under the plan through the use of rates (determined in accordance with methods and standards developed by the State ...) and which, in the case of hospitals, take into account the situation of hospitals which serve a disproportionate number of low income patients with special needs ... *which the State finds, and makes assurances satisfactory to the Secretary, are reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities in order to provide care and services in conformity with applicable State and Federal laws, regulations, and quality and safety stan-*

dards *and to assure that individuals eligible for medical assistance have reasonable access ... to inpatient hospital services of adequate quality....*

42 U.S.C. § 1396a(a)(13)(A) (emphasis added).

**3.** The regulations provide as follows:

(a) *State assurances.* In order to receive HCFA approval of a State plan change in payment methods and standards, the Medicaid agency must make assurances satisfactory to HCFA that the requirements set forth in paragraphs (b) through (g) are being met, must submit the related information required by § 447.255 [which requires detailing the *"amount of the estimated average proposed payment rate for each type of provider ... and the amount by which that estimated average rate increased or decreased relative to the average payment rate in effect for each type of provider for the immediately preceding rate period"*], and must comply with all other requirements of this subpart.

(b) *Findings.* Whenever the Medicaid agency makes a change in its methods and standards, but not less often than annually, the agency must make the following findings:

(1) *Payment rates.* (i) The Medicaid agency pays for inpatient hospital services and long-term care facility [which includes ICFs, *see* 42 C.F.R. § 447.251] services through the use of rates that are reasonable and adequate to meet the costs that must be incurred by efficiently and economically operated providers to provide services in conformity with applicable State and Federal laws, regulations, and quality and safety standards.

(ii) With respect to inpatient hospital services—

(A) The methods and standards used to determine payment rates take into account the situation of hospitals which serve a disproportionate number of low income patients with special needs....

42 C.F.R. § 447.253 (emphasis added).

cedures under the Medicaid Act. In *Pinnacle*, New York had adopted, as part of its 1986 Medicaid plan, the Regional Direct Input Price Adjustment Factor ("RIPAF"), under which the average wage rate for facilities within each of the State's 16 regions was calculated for the base year of 1983, and every facility reimbursed based upon the "average wage rate" within the region, regardless of actual wage rates at a particular facility. *See Pinnacle Nursing Home v. Axelrod*, 719 F.Supp. 1173, 1176 (W.D.N.Y.1989).

The RIPAF was fully approved by HCFA. *See id.* at 1177. Ten months after the 1986 RIPAF methodology had been implemented, however, New York's Department of Health ("DOH") advised the nursing homes throughout New York that the 1986 RIPAF would be altered by the "1987 Adjustment to RIPAF." *See Pinnacle*, 928 F.2d at 1310. This "Adjustment" created a "statewide positive or negative 10% corridor" around the previously established regional average wage rates, and provided that all nursing homes whose actual 1983 costs fell within the specified "corridor" would no longer be reimbursed based on the regional average wage rate, but rather upon a portion of each facility's actual reported 1983 wage rate. *See id.*

The effect of the "Adjustment" was to benefit those facilities whose higher labor costs resulted from historical factors beyond their control, as well as any other high-cost residential nursing home facility, regardless of the cause of its respective high costs, at the expense of lower-cost facilities. *See id.* at 1311. Put another way, *some facilities would receive more money than that to which they were entitled under the 1986 RIPAF methodology, while others would receive less.*

The State contended that the "Adjustment" was not a "significant change" since it was budget neutral, affecting not the amount of Medicaid funds, but merely its allocation. The State therefore contended that the "Adjustment" was not an amendment which required prior notice to and approval of HCFA as required by 42 C.F.R. § 447.253. HCFA disagreed, but, upon notification by New York that assurances which had been submitted to HCFA in support of an unrelated change in New York's Medicaid plan also constituted assurances in support of the "Adjustment," HCFA approved the Adjustment retroactively.

The District Court found a procedural violation but not a substantive violation of the Medicaid Act, and summarily dismissed the substantive claim "[i]n deference to the federally mandated priority of the states to determine their own Medicaid plans." *Id.* at 1312.

In affirming this holding, the Circuit held that the statutory language clearly requires that the State make findings that its reimbursement rates are "reasonable and adequate to meet the costs which must be incurred by efficiently and economically operated facilities," *see* 42 U.S.C. § 1396a(a)(13)(A) prior to making the "assurances" to HCFA that its Medicaid plan complies with Federal requirements. The procedural requirements of the Boren Amendment, therefore, are not "mere surplusage." 928 F.2d at 1313; *see also, Wilder v. Virginia Hosp. Ass'n*, 496 U.S. 498, —— n. 11, 110 S.Ct. 2510, 2519 n. 11, 110 L.Ed.2d 455, 469 n. 11 (1990).

*Pinnacle* makes clear that, where there is a change in payment methods and standards, the procedural steps in the governing regulations are mandatory. Unfortunately, in the present case, it does not appear that the lag is a change in "payment method and standards." Although plaintiff and the intervenor repeatedly state, in a conclusory way, that the lag is in reality a "withholding" and a "reduction," such characterization is simply using the conclusion to create premises.

As pointed out in the defendants' brief, neither plaintiff nor the intervenor cite any statute, regulation, case law, *or even a portion of the State Plan* requiring the State to make Medicaid payments in 10 business days as has been the past practice. Plaintiff cites and selectively quotes the federal regulation governing timely processing and payment of claims, omitting the portion that shows the inapplicability of

regulations to the present controversy.[4] A cursory reading of that regulation reveals that the State is required by federal law to make payments on clean claims within 12 months of the date of receipt of such claims. Even with the two-week lag in effect, then, the State payment schedule, under which the providers will be paid within 28 calendar days of submitting claims, is well within the limits set by the federal regulation.

Defendants have provided a case which is virtually on all fours with the present controversy. In *Illinois Council on Long Term Care v. Bradley*, 759 F.Supp. 1309 (N.D.Ill.1991), plaintiffs nursing homes and health care association brought an action for declaratory and injunctive relief against the director of the Illinois Department of Public Aid ("IDPA"), the Illinois Medicaid agency, as well as the Comptroller and Treasurer of the State of Illinois. Plaintiffs sought a preliminary injunction, claiming that the slowdown in Medicaid reimbursements to nursing homes violated the Medicaid Act and implementing regulations. *Id.* at 1310.

The IDPA had established monthly billing cycles, and had an historical median delay of approximately 30 days between receipt and commencement of processing claims, with an additional 30 day delay before reimbursement was paid to the providers. *See id.* In fiscal years 1989 and 1990, however, the first 30 day period increased to 40 days. In fiscal 1991, November 1990 services were reimbursed between 80 and 90 days after presentation of the claim, and December services were reimbursed over 100 days later. *See id.* at 1310–1311.

Plaintiffs alleged, as do UCPA and St. Lukes in the present case, that such delays violated the "methods and standards" regulation discussed *supra*. The Court rejected this position, and refused to issue the requested injunction. To emphasize the parallels with the present case, much of the Illinois District Court's opinion is quoted here:

[I]t is the State Plan which must comply with 42 U.S.C. § 1396a(a), and not the "practices," "intentions," or "expectations" of the agency and the providers. Plaintiffs' allegations of a slowdown simply constitute a change in practice by IDPA. A new practice, even one that imposes great hardships on Medicaid providers, that does not violate the provisions of the State Plan cannot, by itself, cause the Plan to contravene the federal requirements with which the Plan has been found to comply.

Plaintiffs contend that, by paying in a slower manner than was previously the practice of IDPA, the agency has violated 42 C.F.R. § 447.253(a) and (b). [*see* discussion *supra*].

\* \* \* \* \* \*

An agency does not encounter the requirements of 42 C.F.R. § 447.253(a) and (b) unless a change has been made to the state plan's "methods and standards." Throughout this subpart of the federal regulations, the term "methods and standards" relates to payment rates.... Thus, unless the IDPA slowdown amounts to a change in the "methods and standards" of payment rates, IDPA is not required to make the assurances and findings specified in 42 C.F.R. § 447.-253(a) and (b).

Plaintiffs equate delayed payments with reduced payments, which would constitute a change of rates under the State

---

**4.** The regulation cited by plaintiff provides:

(d) *Timely processing of claims.*

\* \* \* \* \* \*

(2) The agency must pay 90 percent of all clean claims from practitioners, who are in individual or group practice or who practice in shared health facilities, within 30 days of the date of receipt.

(3) The agency must pay 99 percent of all clean claims from practitioners who are in individual or group practice or who practice in shared health facilities within 90 days of the date of receipt.

(4) The agency must pay all other claims within 12 months of the date of receipt, except in the following circumstances [none of which is relevant here]....

42 C.F.R. § 447.45(d)(2)–(4). Plaintiff omitted the types of entities in subparagraphs (2) and (3), and has not stated that its facilities come within the scope of those subparagraphs.

Plan. However, plaintiffs cite no authority for this position. Most of the cases cited by plaintiff pertain to actual rate changes. The remainder involve rate freezes. None of the cases concern delays in reimbursement without alleging that the actual payment rates used by the state agency are different from those set out in the state plan. Plaintiffs make two arguments to equate the slowdown to a rate reduction. First, plaintiffs claim that the slowdown is tantamount to a decision by the IDPA to make no payments for November and half of December, 1990. Second, plaintiffs try to equate the slowdown to a rate reduction of 12.5 percent for 1990. Both of these positions would be correct if IDPA had taken the posture that no reimbursement for services rendered during that one and a half month period would be forthcoming. However, the circumstances are to the contrary. *IDPA has not denied liability for that period, and has stated that it plans to reimburse plaintiffs for that period at the rates and in the time frame set forth by the State Plan.* At this point, plaintiffs are unable to, and have no reason to, disapprove this assertion. Thus, plaintiffs' attempts to equate delayed payment with reduced payment are unpersuasive.

*Id.* at 1312–1313 (emphasis added).

This Court finds the rationale of the *Bradley* court to be persuasive. The only element present in *Bradley* that is missing in this case is whether there is any provision in New York's State Plan relating to the timeliness of payment. Neither side has cited any portion of the State Plan.

Absent a showing that the State Plan would be violated by the lag here at issue, UCPA and St. Lukes have failed to demonstrate a likelihood of success on the merits with respect to the Boren Amendment claim. As in *Bradley*, UCPA and St. Lukes have not established that the lag is a change in the "methods and standards of payment." Also as in *Bradley*, the cases cited by the UCPA and St. Lukes all involve actual percentage reductions in *amounts* paid or the implementation of "caps" or suspension or elimination of incentive allowances. *See, e.g., Temple University v. White*, 941 F.2d 201 (3d Cir.1991), *cert. denied sub nom., Snider v. Temple University*, ─── U.S. ───, 112 S.Ct. 873, 116 L.Ed.2d 778 (1992) (invalidating, *inter alia*, 14% rate reduction based on a "budget neutrality adjustment", for failure to comply with 42 U.S.C. § 1396a(a)(13)(A)); *Association of Surrogates and Supreme Court Reporters Within the City of New York v. State of New York*, 940 F.2d 766, 769 (2d Cir.1991), *cert. denied*, ─── U.S. ───, 112 S.Ct. 936, 117 L.Ed.2d 107, (1992) (invalidating, under Contract Clause of the federal Constitution, a lag program where a two week lag phased in by paying 9 days' pay for ten days' work, and where uncompensated days would be paid to employees "at the termination of their employment with the state."); *West Virginia University Hospitals, Inc. v. Casey*, 885 F.2d 11 (3d Cir.1989), *aff'd*, ─── U.S. ───, 111 S.Ct. 1138, 113 L.Ed.2d 68 (1991) (invalidating state plan where out-of-state hospitals reimbursed on basis of average payments to in-state hospitals, without accounting for disproportionate share of Medicaid patients and without making requisite findings); *AMISUB (PSL), Inc. v. State of Colorado Department of Social Services*, 879 F.2d 789 (10th Cir.1989), *cert. denied*, ─── U.S. ───, 110 S.Ct. 3212, 110 L.Ed.2d 660 (1990) (invalidating state's new reimbursement plan which resulted in cutting provider reimbursement by 46% across the board); *Wisconsin Hospital Ass'n v. Reivitz*, 820 F.2d 863 (7th Cir.1987) (invalidating 1.8% reduction in reimbursement); *Nebraska Health Care Ass'n, Inc. v. Dunning*, 778 F.2d 1291 (8th Cir.1985), *cert. denied*, 479 U.S. 1063, 107 S.Ct. 947, 93 L.Ed.2d 996 (1987) (invalidating HCFA's approval of "cap" on reimbursement where sufficient findings not made, therefore no factual basis for "assurances" made to HCFA); *St. Tammany Parish Hospital Service District v. Department of Health and Human Resources*, 677 F.Supp. 455 (E.D.La. 1988) (finding emergency rule creating 10% reduction of interim Medicaid reimbursement rates to violate 42 C.F.R. § 447.253); *Association of Surrogates and Supreme*

*Court Reporters Within the City of New York v. State of New York,* 79 N.Y.2d 39, 580 N.Y.S.2d 153, 588 N.E.2d 51 (1992) (invalidating, under the Contract Clause of the federal Constitution, a payroll lag where deferred wages "to be paid in lump sums when the employees' service is terminated, either by retirement or death, at the basic annual salary in effect at that time."); *Matter of Quirk v. Regan,* 148 Misc.2d 300, 565 N.Y.S.2d 422 (Sup.Ct. Albany Co.1991) (invalidating payroll lag under federal Contract Clause); *McDermott v. The Unified Court System of the State of New York,* RJI # 01–90–ST2725, 1991 WL 302648 (Sup.Ct.Albany Co.1991) (finding collateral estoppel effect of *Quirk* ); *see also* federal and state cases cited at Proposed Intervenor's Mem. at 24.

Further, as in *Bradley,* UCPA and St. Lukes argue that the State will never pay the providers for the two weeks during which they will not receive a check. The State maintains that the providers will certainly be paid, just at a later time. Similarly, plaintiff and the intervenor characterize the lag as a "reduction," but without authority and, therefore, without force.

For the foregoing reasons, the Boren Amendment argument advanced by plaintiffs is insufficient to warrant the issuance of an injunction.

*Taking Without Due Process of Law and Just Compensation*

■ Because the "taking" arguments of both UCPA and St. Lukes are based upon the underlying premise that the delay is a permanent withholding and a change in the rates of reimbursement, which presumption is not, in this Court's opinion, correct, the taking arguments must fail as well.

This Court recognizes that "New York acknowledges a property interest in money paid for services already performed in reliance on a duly promulgated reimburse-ment rate." *Oberlander v. Perales,* 740 F.2d 116, 120 (2d Cir.1984). Were the present case to involve, as did *Oberlander,* a rate revision or a change in rates, the arguments advanced by UCPA and St. Lukes might have some force.

In the present case, however, there is no taking, much less one without just compensation or due process of law. Plaintiff merely argues that the state cannot "limit or reduce" the rates of Medicaid reimbursement solely due to budgetary considerations, and cannot alter plaintiff's "property right in reimbursement for the services rendered" without due process of law.

This Court has already determined that the delay is not a "reduction" in payment; nor is it a "limitation." Plaintiff will be paid in full, pursuant to the already extant rate of reimbursement, albeit received two weeks later than had been the practice prior to the implementation of the lag. Plaintiff's property interest has not been "taken." [5]

■ Intervenor argues that, because state law requires hospitals to provide emergency care to persons regardless of ability to pay or source of payment, the state has "taken" private property and must therefore provide just compensation. Assuming, without deciding, that such state law constitutes a taking, intervenor has not demonstrated that the amount of money paid pursuant to established rates is not "just compensation" but, by again characterizing the delay as "confiscatory" and "fail[ure] to pay." *Failure* to pay, as well as inadequate payment, may constitute a lack of just compensation. Neither plaintiff nor intervenor, however, has demonstrated to this Court that there is a property interest in the *time* of payment. Nor has any statutory or regulatory provision, case law, or provision in the State Plan, been cited to support the position that payment is required to be at a particular time.

---

5. Even assuming, *arguendo,* that the delay were a taking, plaintiff received both notice and an opportunity to be heard. Plaintiff was first notified of the impending delay by letter dated August 13, 1991. *See* Mastrototaro Aff. Par. 14. All affected providers were given an opportunity to be heard as well. *See id.* In fact, defendants contend that, in response to provider requests, the delay was rescheduled to begin later than originally planned. *See id.* par. 15.

The Court therefore declines to issue an injunction based upon the foregoing "taking" arguments.

*Equal Protection*

■ Plaintiff argues that the delay, targeting only nongovernmental providers, thereby violates its rights to Equal Protection under the federal and state Constitutions. In response, defendant, through an affidavit of Ben Mastrototaro, Associate Commissioner for Medicaid Centralized Operations in the New York State Department of Social Services, states that the delay applies to all Medicaid providers, both governmental and nongovernmental, which are paid through the Medicaid Management Information System ("MMIS"). *See* Mastrototaro Aff. par. 20. In reply, plaintiff asserts that, unlike the ICFs it operates, which are paid through the MMIS, the state-operated ICFs are *not* paid through the MMIS. Therefore, argues plaintiff, "defendants have in fact singled out providers such as UCPA for the permanent withholding." Parker Reply Aff. par. 16.

Plaintiff has not demonstrated to this Court, as it must for the issuance of a preliminary injunction, that it is likely to succeed on the merits of its Equal Protection claim. Plaintiff has not shown that the delay, which targets a particular payment *system*, not a particular type of provider, lacks a rational basis or fails to further a legitimate government interest. This argument is unavailing.

■ Finally, to the extent the UCPA and St. Lukes claim state law grounds to support the issuance, by this Federal Court, of an injunction, such relief is barred by the Eleventh Amendment. *See Pennhurst State School and Hospital v. Halderman,* 465 U.S. 89, 106, 104 S.Ct. 900, 911, 79 L.Ed.2d 67 (1984) ("[I]t is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law. Such a result conflicts directly with the principles of federalism that underlie the Eleventh Amendment.").

The Court therefore makes the following findings of fact:

(1) Plaintiff United Cerebral Palsy Associations of New York State, Inc. ("UCPA") is a not-for-profit provider that operates Intermediate Care Facilities ("ICFs") and community residences for the mentally retarded and developmentally disabled, under licenses of the New York State Office of Mental Retardation and Developmental Disabilities ("OMRDD"). UCPA also operates Diagnostic Treatment Centers under licenses of the New York Department of Health ("DOH"), and provides transportation services to its clients.

(2) Proposed Intervenor St. Lukes–Roosevelt Hospital ("St. Lukes") is a not-for-profit hospital corporation located in Manhattan, with 1,300 patient beds, 6,500 employees St. Lukes and is one of the largest nongovernmental provider of care to Medicaid patients in the State.

(3) By letter dated August 13, 1991, the New York State Department of Social Services ("DSS") informed plaintiff of the initiation of a delay in payment of Medicaid checks by one week, to be gradually phased in by delaying the payments one day per week. Under the original delay as described in that letter, no check would be received by plaintiff during the week of December 30, 1991 to January 3, 1992. Such check would be received one week later.

(4) By subsequent letter, providers were informed that the week during which no check would be received had been changed to the week of February 3–7, 1992.

(5) By letter dated January 6, 1992, DSS informed providers that a second week-long delay would be instituted, as a result of which check would not be received during the week of March 16–20, 1992. This second delay would be phased in by delaying checks one day per week during the months of February and March.

(6) One week's Medicaid payments to plaintiff UCPA and its 25 New York state affiliates and divisions is approximately $3 million.

(7) One week's Medicaid payments to intervenor St. Luke's–Roosevelt Hospital is approximately $3.4 million.

(8) The delay has in fact been implemented, with the first week-long delay planned for week of February 3–7, 1992.

The Court makes the following conclusions of law:

FIRST: UCPA and St. Lukes have not demonstrated a likelihood of success on the merits of their claim that the Medicaid payment lag is a change in the methods and standards of payment implicating the "findings" and "assurances" requirements of 42 U.S.C. § 1396a(a)(13)(A) and 42 C.F.R. § 447.-253(a) & (b).

SECOND: UCPA and St. Lukes have not demonstrated a likelihood of success on the merits of their claims that the Medicaid payment lag is a taking of their property without just compensation and/or due process of law.

THIRD: Plaintiff has not demonstrated a likelihood of success on the merits of its claims that the Medicaid payment lag denies it equal protection of the law under the federal Constitution.

FOURTH: To the extent UCPA and St. Lukes rely upon alleged violations of state law by the defendants in support of the motion for an injunction, such relief is barred by the Eleventh Amendment.

FIFTH: The Court, having declined to issue a preliminary injunction on the ground that movants have failed to demonstrate a likelihood of success on the merits of their claims, does not reach the issue of irreparable harm.

SIXTH: The Court grants St. Lukes–Roosevelt Hospital's motion to intervene in this action.

IT IS SO ORDERED.